532

## HARRIS v. UNITED STATES.
### No. 6067.

Court of Appeals of the District of Columbia.
Argued March 5, 1934.

Decided May 14, 1934.

Rehearing Denied June 11, 1934.

Harry T. Whelan, Neil Burkinshaw, and William B. O'Connell, all of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and Julian I. Richards, Asst. U. S. Atty., both of Washington, D. C.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

MARTIN, Chief Justice.

The appellant, Charles Harris, together with one Harry Davis, was indicted in the Supreme Court of the District of Columbia charged with the murder of Milton White Henry. Davis was not apprehended. The appellant pleaded not guilty and went to trial. The jury returned a verdict of guilty of murder in the first degree. Judgment and sentence were pronounced by the court upon the verdict, whereupon the present appeal was taken.

The record contains all of the evidence introduced in the trial and we have examined it with careful attention.

It appears from the evidence that on the morning of April 21, 1932, at about 6 o'clock, when it was fully daylight, Milton White Henry was driving alone in a Chevrolet roadster, with the top down, proceeding west on Meridian street N. W., in Washington, D. C. As he came to the corner of Brown and Meridian streets he turned north upon Brown street toward the apartment building known as "Oaklawn Terrace," in which he was a tenant. This course would take him up Brown street and past its intersection with Oak street. After proceeding about fifty feet along Brown street his car was stopped by a milk wagon standing in front of an apartment house located on the northeast corner of Brown and Meridian streets. The driver of the milk wagon had entered the building to serve some customers. At this point there were automobiles parked upon each side of Brown street, which is a very narrow street, and Henry's car could not proceed northward because of the milk wagon

and the parked cars. He consequently was compelled to slow up and come to a stop. At that moment a large Hudson sedan bearing a New Jersey license occupied by two men drove into Brown street from Meridian street directly behind Henry's car, and a man jumped out of it carrying a sawed-off shotgun in his hand. The man rapidly approached Henry's car from the rear, somewhat to the left, and fired five shots into Henry's body as he sat at the wheel of his car, killing him instantly. The Hudson car, whose motor had been continuously running, then backed down Brown street so as to turn east on Meridian street, and the man who had fired the shots hurriedly got into the car. As he approached the Hudson car he called to the driver, "Keep moving," and as he stepped on the running board he said, "Step on it." The car was backed some distance on Brown street and turned into Meridian street and immediately disappeared, going east on Meridian street. The car was found abandoned on a street in Washington a few hours after the homicide, and was identified by witnesses. The car in which Henry sat drifted slowly into the rear of the milk wagon and there stopped with its motor still running. Henry's lifeless body, terribly mangled by the slugs which entered it, was found slumped upon the driver's seat of his car with his right hand under his body clutching a so-called "Banker's Special" revolver, with a short barrel. Henry had not fired a shot, and it is plain that he was taken entirely unawares by his assailant, and was unconscious of the danger threatening him.

Brown street at this point is flanked by two-story residences standing flush with the sidewalk, except for the apartment house above mentioned. These residences, as well as the lower floor of the apartment house, were occupied by tenants, who were alarmed by the reports of the shooting and who saw the assailant making his escape. A pedestrian upon the sidewalk immediately next to the car also saw the assailant as he was hurrying to the Hudson car.

As to the facts and circumstances attending the homicide itself there is no dispute. The sole question in the case relates to the identification of the defendant as the assailant. The defendant himself did not testify as a witness at the trial, but submitted the testimony of other witnesses in support of an alibi tending to prove that defendant was in the city of New York all of the time during April 20, and April 21, 1932.

██ Upon a review of the evidence we are convinced that it fully sustains the verdict of the jury.

The government produced as a witness, Carrel F. Rhodes, a member of the bar employed as an attorney of the Federal Trade Commission, who lived at this time in a house immediately opposite to and facing the place of the homicide, and about fifty to sixty feet distant from it. The witness testified in substance that he heard the firing of the five shots and looked out of his window; that he saw a man cross the street at a point about fifty or sixty feet from where he was, and at a point about forty feet from the intersection of Meridian and Brown streets; that this man was going south on Brown street and crossed from the west to the east side of the street, and south on the east side of the street; that the man carried a sawed-off shot gun in his left hand hanging down his left side; that he saw the Hudson automobile, and as the man approached it he called out, "Keep moving"; that the car was in front of the witness' apartment in the middle of the street resting on Brown street; that it turned to head down Meridian street to go east and as the man approached the car and stepped on the running board he said, "Step on it"; that the car shot over on the sidewalk and disappeared down Meridian street going east; that he had a good look at the man and heard his voice distinctly; and he identified the defendant as the man.

The government witness James F. Hughes testified in substance that he was a driver for a laundry; that his route covered the vicinity in question; that on April 20, 1932 [the day before the homicide], he was traveling in his truck on Brown street in the course of his employment and saw the automobile which had been identified as that driven by the man committing the crime parked on Brown street at the corner of Oak street, facing south on Brown street; that this was about 1 o'clock; that he saw two men in the car at that time; that after he saw the car in that place, he went into the Oaklawn Terrace, made his deliveries, and then came out; that he again saw the car occupied by the two men parked in about the same place at the corner; that he then went about his deliveries and came back there later on his second trip at about 2:30 or 3 o'clock, and approached Brown street coming by way of Meridian street; that he saw the same car then parked facing east on Meridian street; that he noticed the two men in the car; that he had seen the same car just about an hour or so before parked on Brown street at Oak street and the same two men in it; that lying on the back seat he saw something like a large-sized suitcase; that he looked at the

men; that later he made another trip there and after coming north on Brown street went into the Oaklawn Apartment and came out on his return trip; that he went straight down Brown street going south; that he came back on the third trip about 4 o'clock and went down Brown street; that he was going north, and he was going into the same apartment building; that he saw the same machine there again; that at that time the machine was parked at Brown street and Oak street, closer to the corner of Oak; that the machine was so parked that it made it inconvenient for him to get around; that the car was parked in about the same place as he saw it on his first trip, only it was a little bit farther from the corner; that at that time, the car was parked on Brown street facing south; that the machine was out in the street, because it made it rather hard for him to turn his truck around the car; that he blew his horn, the car pulled up, and he went past and nothing was said; that he saw the same two men in the car; that he stayed in the apartment about ten minutes; that he observed that the motor of the car was running; that when he came out of the apartment he saw the car and it seemed to be farther back of the corner than it was when he went into the apartment; that the car was parked farther out in the street, because he could not get by there; that he had to blow his horn; that he blew his horn two or three times; that he said, "You ought to move out," and the fellow who was driving said, "Hell, are you around here again"; that they then pulled over and he went on. The witness identified the defendant as one of the two men he saw in the car at that time.

The government introduced other evidence consistent with the foregoing but without a distinct identification of the defendant.

In our opinion the jury were entitled to believe the testimony of these two witnesses, and to conclude that the testimony given by the alibi witnesses was mistaken. It appears from the testimony of the witness Hughes that the defendant on the day preceding the homicide stationed his automobile with its motor continuously running at various points which the deceased would be compelled to pass on his way to his home, and that the murder was the result of a deliberate plan whereby the defendant lay in wait for the deceased in order to kill him.

The motive for the crime is not disclosed by the evidence. The appellant, however, in an affidavit made by him in support of his motion for a new trial, states that he was friendly with the murdered man, Milton W. Henry, and that on an occasion which he thinks was in November, 1931, he drove down from New York to Washington and registered at the hotel as Mr. and Mrs. Charles Berman, at which time he saw Henry and visited at his home; and that Henry and himself were friendly and he had not the slightest reason to do him any harm.

In this appeal the appellant relies upon ten assignments of error.

■ He claims first that the court erred in overruling his motion to quash the indictment. This motion was based upon the charge that the indictment contained unnecessary allegations and surplusage. The basis of this charge is that the defendant is named under various aliases in the indictment and this tended to persuade the jury that they were dealing with a professional criminal. We find no merit in this assignment. It appears from the record that when the defendant was arrested he gave his name as Charles Harris; later to the detective sergeant he gave the name of Charles Bernstein; that he was known to one of his witnesses as Charles Berman; and that in an affidavit filed in support of his motion for a new trial defendant gave his name as Charles Bernstein. There is no evidence in the record concerning the use of other aliases by the defendant, but the motion to quash was heard by the court, and in the absence of evidence it may be assumed that the government made a proper showing at that time that the defendant had been known at various times under the aliases set forth in the indictment.

■ The second and third assignments of error charge that the court erred in admitting in evidence, and permitting the government to display to the jury, the Government's Exhibit No. 2. This exhibit is a photograph showing the body of the deceased as it lay in the car immediately after the homicide. The photograph was properly identified and showed not only the body of the deceased in his car but also the general situation existing at the place of the shooting. This tended to explain and corroborate the testimony of Government witnesses in relation to the locality. We find no error in the court's action. Robinson v. United States, 61 App. D. C. 370, 63 F.(2d) 147.

■ Assignment No. 4 charges that the court erred in refusing to interrogate the jury as to whether they read articles appearing in the newspapers concerning the case. The record discloses that on the second morning of the trial the defendant's counsel called the court's attention to certain newspaper articles re-

ferring to the trial, claiming them to be of a highly prejudicial character. Counsel expressed the apprehension that they might come to the notice of the jury, however closely they were guarded. The court thereupon seasonably instructed the jury as follows: "I will caution the jury, out of abundance of precaution, that you are not to read any article in any newspaper in regard to this affair; and I caution the deputies in charge of the jury that they are not to give any newspapers in to the jury with any articles in regard to this case in them. That is the rule you have always followed, Mr. Deputy Marshal and Miss Deputy Marshal; and that rule has been followed in this case?" Whereupon the deputy marshal answered: "Yes, sir."

The fifth assignment of error is that the court erred in permitting counsel for the government to cross-examine the witness Mrs. Agnes Brenser regarding an arrest of the defendant in Newark, N. J. This assignment is not material for the court at a later time in the trial struck out the testimony referred to.

In assignment No. 6 the appellant charged error of the court in refusing to grant a delay to the defendant during the course of the trial for the purpose of producing material witnesses. The record, however, discloses that after the district attorney had finished his opening address to the jury the witness who was desired by the defense appeared and his testimony was taken. The court did not err in refusing to grant a delay to the defendant under the circumstances, but if this was error it was not prejudicial in view of the fact that the witness finally arrived and gave his testimony.

In the seventh assignment of error it is alleged that the court erred in making a statement before the jury to the effect that it would permit certain testimony offered on behalf of the defendant by the witness Goldstein "in for what it is worth. I do not see that it is material." We are unable to see that there was any error in this observation of the court.

In assignments 8, 9, and 10, the defendant complains that the court permitted the government counsel to cross-examine witnesses on collateral and immaterial matters and to argue to the jury in such manner as to inflame the jury and prejudice the rights of the defendant, and in permitting government counsel throughout the course of the entire trial to state to the jury collateral and immaterial matters highly prejudicial to the defendant and to unnecessarily emphasize and bring them to the attention of the jury so as to deprive him of a fair and impartial trial.

We find no support in the record for these assignments of error. Among other things, appellant charges that the government counsel in his closing argument to the jury stated that the murder was a typical gangster murder and that the defendant was a typical gangster. This was not error. "A prosecuting officer is at liberty to form his own theory of a case, and to pursue it in the course and manner of the trial, so long as the theory is consistent with the evidence." Lomax v. United States, 37 App. D. C. 414. The circumstances appearing in the present case afford ground for the theory that this murder was a typical gangster murder. The manner in which the defendant pursued Henry and killed him, and the fact that Henry was driving his car with a loaded revolver in his hand, as if in constant fear of his life, permit of the theory which the prosecutor urged upon the jury.

The court in its charge to the jury clearly and correctly covered the case and no exception was taken to any of its instructions. In the course of the charge the court said: "In this case the beliefs or the opinions or the contentions of counsel are to be given no weight whatever by you in arriving at your verdict." The defendant requested the court to give three certain instructions in charge to the jury; these were given by the court as requested.

No error of law occurring at the trial is manifest in the record, and we affirm the judgment of the lower court.