The above quoted opinion of the Court aptly sets forth the views of this Court in this case.

 The award of $65,000 actual damages and the award of $225,000 punitive damages in an action of this sort are each so excessive as to be necessarily the result of passion, prejudice and sympathy; therefore, defendant's alternative motion for a new trial must be sustained upon the grounds set forth in the first three paragraphs of defendant's Motion for New Trial.

Order will be entered consistent with this memorandum.

Charles S. BERNSTEIN, Plaintiff,

v.

NATIONAL BROADCASTING COMPANY, Defendant.

Civ. A. Nos. 3517–52, 5663–52.

United States District Court, District of Columbia.

March 17, 1955.

Harry P. Warner, Washington, D. C., for plaintiff.

Percy A. Shay, Sidney H. Willner, Washington, D. C., for defendant.

KEECH, District Judge.

This case is before the court on the defendant's motion for summary judgment in two consolidated actions for invasion of privacy.

Both actions arise from the same undisputed facts. In 1919 plaintiff, Charles S. Bernstein, was convicted of bank robbery in Minnesota and sentenced to imprisonment for forty years. After serving nine years, he was paroled and pardoned. In 1933 in the District of Columbia, plaintiff, under the name Charles Harris, was tried and convicted of first-degree murder and sentenced to death by electrocution. In 1934 the conviction was affirmed, Harris v. U. S., 63 App.D.C. 232, 71 F.2d 532, and a petition for certiorari denied by the Supreme Court, 293 U.S. 581, 55 S.Ct. 94, 79 L.Ed. 678. Through the efforts of a number of interested persons and committees working in plaintiff's behalf,[1] and partly as the result of the work of Martha Strayer,[2] a reporter on the

---

1. Plaintiff's deposition, pp. 97–98, 136–138.

2. Miss Strayer was named a defendant in the original complaint and first amended complaint in Civil Action 3517–52, but the case was dismissed as to her before filing of the second amended complaint, now before the court.

Washington Daily News, in 1935 the death sentence was commuted to life imprisonment. In 1940, after plaintiff had served five years at various federal institutions, he received a conditional release from his life sentence, and in 1945 a Presidential pardon.

Plaintiff alleges that, "Commencing in 1940, and thereafter, * * * [he] was no longer in the public eye; * * * lived an exemplary, virtuous, honorable, righteous, quiet and private life, free from the prying curiosity which accompanies either fame or notoriety; * * * shunned and avoided notoriety and publicity; * * * never exhibited or sought to exploit his name, personality or the incidents of his past life for money, profit, or commercial gain; * * assumed a place in society, knew many people and made many friends who were not aware of the incidents of his earlier life."

Plaintiff's deposition shows that from the time of the trial until 1940, when plaintiff secured conditional release, his story was given much publicity by the newspapers and others working on his behalf. Subsequent to his release in 1940, he obtained government employment in the District of Columbia, holding various positions and attaining Civil Service Grade CAF–11. In 1945, this employment ended, and thereafter, from 1945 to 1951, he lived in Front Royal, Virginia, operating a "resort lodge." In February, 1953, some time after the filing of these actions, plaintiff again secured government employment in the District, rooming in Washington but still maintaining his family home in Front Royal, Virginia.

In 1936 or 1937 a detective story magazine carried an article on plaintiff's case.[3] In 1948 a radio program told plaintiff's story, using Martha Strayer's name, in a fictionalized version, but so similar to the facts that plaintiff and several others identified the story as his.[4]

On January 18, 1952, the defendant NBC telecast "live" over 39 stations in its network a television program prepared by Prockter Television Enterprises, Inc., sponsored by American Cigarette & Cigar Company [5] and advertising Pall Mall cigarets, entitled "The Big Story." This program, classified by the Federal Communications Commission as a network commercial entertainment program, was a fictionalized dramatization based on the plaintiff's conviction and pardon, and lauding the efforts of Miss Strayer, the Daily News reporter, toward securing commutation of plaintiff's sentence. The same program was telecast over twelve other NBC network stations by means of a kineoscope recording on January 29, 31, February 1, 2, 3, and 8, 1952. The only true names used were those of Martha Strayer, the Washington Daily News, the President of the United States, and the District of Columbia. Over forty-three of the NBC stations telecasting "The Big Story," it was announced a week prior to the telecast here involved, that the following week's program would tell the true story of how Martha Strayer fought to save the life of an innocent man convicted of murder.[6] On January 7, 1952, NBC issued a press release concerning the program.[7] Neither the tele-

3. Plaintiff's deposition, pp. 116–117.

4. Transcript of argument on motion for summary judgment (hereinafter referred to as "Tr."), pp. 173, 181, 183, 184; plaintiff's deposition, pp. 138–139.

5. Now American Tobacco Company.

6. The announcement was: "Next week .. from the front pages of the Washington Daily News comes the Big Story of reporter Martha Strayer, as she wrote it, as she lived it. A story of an innocent

man in death row marking days off a calendar—and a reporter's fight to save his life. You will see it on the Big Story next week at this same time over this same station." (Answer of defendant to plaintiff's interrogatory No. 2, filed October 4, 1954.)

7. "January 7, 1952
"Women (sic) Reporter Frees an Innocent Man and Gets a 'Big Story'
"A women (sic) reporter's experience in uncovering evidence that saved an inno-

vision announcement nor press release mentioned plaintiff's name.

Plaintiff alleges that, although his true name was not used in the telecast, the actor who portrayed him resembled him physically and plaintiff's words and actions were reproduced both visually and aurally, creating a portrayal of plaintiff recognizable to him and to his friends and acquaintances, and clearly identifying plaintiff in the public mind.[8]

Prior to the telecast, Prockter Productions, Inc., obtained a release or waiver of the right of privacy from Martha Strayer to use her name and to portray her in connection with "The Big Story," but no such waiver or release was obtained from plaintiff.

About five days before January 18, 1952, plaintiff learned through his wife's cousin that NBC would carry a television program based upon his past life.[9] He thereupon called the National Broadcasting Company in Washington and on January 17 and 18, 1952, wrote letters to the Company and its manager in Washington, requesting defendant not to broadcast the program.[10] The program was telecast as scheduled.

Plaintiff alleges that the telecast of this program constituted "a willful and malicious invasion of * * * [his] right of privacy as recognized by the laws of New York, Ohio, Illinois, California, Connecticut, Massachusetts, Rhode Island, Pennsylvania, Delaware, Maryland, Virginia, Wisconsin, Alabama, Tennesee, Iowa, Minnesota, Washington, Texas, Michigan, Missouri, Florida, Utah, Georgia, West Virginia, Kentucky, Nebraska, New Jersey, and Indiana," and the District of Columbia, and that by reason of the telecasts "plaintiff's personality has been violated by being exposed, exhibited, and sold to the public; plaintiff has been subjected to the inquisitive notice of the general public to the injury of his personality, to the outrage of the finer sentiments of his nature and to the humiliation of his self-respect; and plaintiff, a private personality and having an individual personality, has thus been made notorious and conspicuous to the public and has been singled out for and identified to the public notice and attention, which is utterly obnoxious to plaintiff; and plaintiff has been caused and has suffered great mental pain and personal injury," for which he asks $250,000 actual damages. Plaintiff further alleges that the acts of defendant NBC were "willful, wanton, malicious, and intentional, and perpetrated with a reckless disregard of the rights of plaintiff and without his knowledge, consent and acquiescence," entitling him to punitive damages of $500,000.

The complaint in Civil Action 3517–52 is drafted on a single tort theory, alleging the telecast on January 18, 1952, over Station WNBW, Washington, D. C. Civil Action 5663–52 is drafted on a multiple tort theory, claiming a separate tort in each of twenty-eight states in which the program was telecast by relay of the "live" broadcast in New York or by re-broadcast by means of kineoscope recording, and asks varying amounts of actual and punitive damages for the telecast in each state.

Defendant in its motion for summary judgment contends that neither of the complaints states a cause of action upon which relief may be granted.

cent man from the electric chair will be dramatized on NBC's authentic Big Story television program Friday, Jan. 18 (9:00 p.m., EST). TV actress Margaret Stewart will portray the reporter, Martha Strayer of the Washington (D.C.) Daily News.

"Sent to the death cell to interview a man awaiting execution, Miss Strayer heard a tragic story and was convinced of his innocence. Racing against time, Miss Strayer uncovered new evidence and was able to deliver a last-minute pardon to the condemned man.

"NBC—New York"

(Exhibit B, attached to defendant's answers to interrogatories.)

8. See footnote 15.

9. Plaintiff's deposition, pp. 7–8.

10. Plaintiff's deposition, pp. 8–10.

Voluminous briefs on the legal points involved have been filed by both parties, the court has had the benefit of very full argument by respective counsel, and in connection with the argument of the motion (by stipulation of the parties) viewed the kineoscope recordings of the program of January 18, 1952, and the announcement of the week before. The facts stated in the complaint and answer are supplemented in detail by many affidavits, stipulations, answers to interrogatories, admissions, and depositions, most illuminating of which is plaintiff's own deposition.

The telecast here involved was one of a series of similar dramatizations, commending the accomplishments of newspaper reporters in bringing criminals to justice or in securing the release of innocent persons convicted of crime. In each of the programs the actual name of the reporter and his paper were used, but the names of other persons portrayed were changed, and the incidents were fictionalized for dramatic effect.

On this particular program, the man convicted of crime was called Dave Crouch and the murdered man Woody Benson. Benson, a gambler running a game in Alexandria, was shot as he walked along the sidewalk in the District of Columbia, by a man riding in a car. Crouch was arrested while asleep on a bench in a bus terminal in Washington. He was inadequately defended at his trial by a Mr. Kendall, an inexperienced court-assigned counsel, who did not call as an alibi witness Crouch's "common-law wife," Helen Slezak, with whom Crouch had spent the day of the murder in New York. Mr. Kendall showed lack of confidence in the success of the defense, in view of Crouch's previous conviction in Minnesota of which he was innocent and for which he had been pardoned. At the trial, the court admitted a detective's statement as to Crouch's Minnesota conviction, omitting any reference to the pardon. Kendall did not call Helen as a witness, on the ground that the "blue ribbon jury," "all respectable property owners," might be prejudiced against a common-law wife, although Dave explained to him that were not legally married because Helen's husband would not give her a divorce. Crouch was convicted on the testimony of a Mrs. Hedlund, a garrulous middle-aged woman, who positively identified him as the murderer whom she had seen, as he fired the shot, when she looked from the window of her upstairs apartment. After conviction, Crouch was pictured as desperately playing solitaire in his cell and checking off on a calendar the days leading up to his execution, whenever Miss Strayer called upon him there.[11]

11. The script contained many jarring inaccuracies apparent to one familiar with criminal procedure in the District of Columbia. For example, the judge referred to the case as "the people's case against David Crouch," instead of "United States v. David Crouch." The judge made ample use of a gavel, a practice not followed in this jurisdiction. Inexperienced counsel are not assigned to defend in capital cases. "Blue ribbon juries" are not used in the District. As ownership of property is not a qualification required of jurors, it would be almost impossible to get a jury composed entirely of property owners. The Superintendent of the District Jail was referred to as the "Warden". The gruesome details of executions were largely fictitious. The condemned man is not furnished all new clean clothes for the occasion but on the contrary wears a clean pair of old denim trousers. The only unusual shave is the shaving of a patch on his head for application of an electrode. Executions were said to take place in a room whose door was visible from Dave's cell in "death row," which contained "plain wooden benches, like in church, and a sink in case somebody gets sick, and the chair." During the period 1932 to 1935, executions were held in the mess hall of the District Jail, where the chair was set up temporarily on the day of the execution, after the tables were cleared away. Witnesses sat on chairs placed in the room for them. The door of the mess hall was not visible down the corridor from "death row." These matters, however, are outside the record in this case.

Martha Strayer was portrayed as interesting a Mr. Burbage, an attorney of thirty-five years' experience in the Department of Justice, in attempting to have Crouch's sentence commuted, and herself discovering that Mrs. Hedlund could not have seen the murderer from her window, which would have been obscured at the time of the crime by leafed-out branches of a tree. Miss Strayer's newspaper stories were credited with bringing into her office a Mrs. Watson, a theretofore unknown eyewitness, who had clearly seen the crime and testified that the murderer was not Dave Crouch. The program represented Miss Strayer as the person whose faith in the innocence of Crouch and investigations and newspaper articles arousing public opinion resulted in saving Crouch the very day before the execution. In the final scene of the program, Crouch was shown with Mr. Burbage thanking Miss Strayer in her office, following his release from "Lewisburg Prison."

The record in the actual criminal case and the pleadings and deposition of plaintiff in this case, reveal: The plaintiff, as Charles Harris, was convicted of first-degree murder in connection with the shooting of Milton White Henry, a Washington gambler, on April 21, 1932, in the District of Columbia. About 6 a. m., while Henry, in his car, was stopped behind a milk wagon in the narrow street in front of his apartment, he was killed by a man who alighted from a Hudson automobile, shot him, and then jumped on the running board of the Hudson, which sped away. Harris was arrested in Philadelphia, while looking in a store window, accompanied by his "wife". At the trial, he was identified as the murderer by a Mr. Rhodes, an attorney with the Federal Trade Commission, who testified that he had seen Harris at the time of the shooting from the window of his apartment and heard Harris tell the driver of the Hudson to "keep moving" and "step on it." Mr. Rhodes testified that the trees in front of his apartment were in bud at the time and "might have been forming leaves," but that he had an unobstructed view of the shooting.[12] The driver of a laundry truck testified that on the day before the crime he had passed by the scene of the murder on three different delivery trips and, five different times, had seen the same car, identified as that driven by the men who committed the murder, with the same two men in it, and that the defendant was one of them.

At the trial Harris was represented by two attorneys of his own selection, one of whom had eight years' experience in the District of Columbia and a largely criminal practice. Plaintiff did not take the stand in his own behalf, but defense witnesses testified that he was in New York at the crucial time. The woman with whom Harris was living in New York was not called at a witness because counsel "didn't want to besmirch her character."[13] Harris and the woman were not legally married because he had a living wife, and the woman's name did not in any way resemble "Helen Slezak." On appeal, Harris was represented by different counsel, one of whom, Mr. Burkinshaw, had had about two or three years' experience with the Department of Justice.

After affirmance of the conviction, new evidence was submitted to the Department of Justice in the form of affidavits from the Department of Agriculture and the Weather Bureau that the trees in front of Mr. Rhodes' apartment would have been fully leafed out at the time of the crime and the testimony of an eyewitness who came forward after the trial, a lady[14] who, after viewing Harris at the Jail, stated he was not the man who did the shooting. Miss Strayer did interview Harris at the Jail on a number of occasions and dis-

---

12. Plaintiff's deposition, pp. 152–153.

13. Plaintiff's deposition, pp. 66, 148.

14. Plaintiff, in his deposition, p. 86, stated he does not know the name of this lady, and her name does not appear in any of the papers before the court.

cussed his case with him, but always in the Superintendent's office or in the "rotunda," not in Harris' cell. Harris did not play solitaire in his cell, as prisoners were not permitted to have cards. He spent a great deal of time reading history, philosophy, and psychology. He did not cross the days off a calendar prior to the execution date, which was postponed eight times by the court. The death sentence was stayed by warrant of reprieve signed by the President four days before the date fixed for electrocution. During the two years he was confined in the "death row" at the District Jail awaiting execution, plaintiff did undergo great mental and emotional strain. The plaintiff, after his release from Leavenworth, went to see Miss Strayer in her office to thank her for her part in securing his release, but he is not sure whether his attorney accompanied him.

Plaintiff alleges that the actor who portrayed Dave Crouch resembled him physically, as he appeared at the time of his trial.[15] For the purpose of this motion, the court will assume that this resemblance exists.

Thus, the points of similarity between the plaintiff's life and the television story of Dave Crouch are reduced to: a conviction in the District of Columbia of first-degree murder in connection with the shooting of a gambler in Washington; failure to call a "common-law wife" as an alibi witness; Miss Strayer's effective interest in proving the defendant's innocence; securing of other counsel after the trial; emotional turmoil of the convicted man while awaiting execution; additional evidence as to the leaves in front of an eyewitness' apartment window; another eyewitness coming forward, after affirmance of the conviction, to state that defendant was not the murderer; thanking of Miss Strayer by the defendant after his release; and a physical resemblance between the actor and the plaintiff as he was twenty years ago.

15. The following appears at pp. 112–114 of plaintiff's deposition:

"Q. Now, Mr. Bernstein, you have listed in your complaint that the actor who portrayed the character David Crouch in the television story resembled yourself. A. Mrs. Russell told me that, the lady that was present at Wardman Park that day [at viewing of the kineoscope recording], said he had a marked resemblance—

* * * *

"Q. Are you able to state any resemblance which you claim exists between yourself—A. *At present, no; but how I looked twenty years ago.*

"Q. In other words, you think that this actor resembled or looked like you, as you did, twenty years ago? A. Yes, very closely.

"Q. Was it because of the shape of his nose or anything like that? A. General conformation of his features, coloration, pigmentation.

"Q. Of course the pigmentation would not show, except as black and white. A. Dark complected, heavy eyebrows, dark heavy hair, the same as I had at one time."

Mrs. Elwood Foster, in her affidavit appended to plaintiff's opposition to the motion for summary judgment, stated:

"* * * I was familiar with the incidents and past life of the plaintiff, and I associated Martha Strayer with Mr. Bernstein's case. * * *

"Mr. Foster and I saw the telecast which reproduced incidents of Mr. Bernstein's past life. We had no difficulty in identifying Mr. Bernstein in the program. I thought that the man who portrayed Mr. Bernstein was similar in appearance. As I remember, the actor had heavy eyebrows, the same build and was stocky, his coloring was dark. I believe that if anyone knew Mr. Bernstein, or if they knew his story or read about it and saw the telecast, they would believe that he was the same person."

Plaintiff's Exhibit No. 1, a clipping from the Washington Daily News of May 29, 1935, shows a three-quarter view of plaintiff's face at the time of commutation of his sentence and a front view at the time of his arrest. Knowing the fallacies of newspaper photographs, this court is not in a position to rule, as a matter of law, that the claimed resemblance did not exist. It would appear to the court, however, that the actor who portrayed Dave Crouch no more resembled plaintiff as he was twenty years ago, than he resembled thousands of other dark-complected, wavy-haired men.

Plaintiff concedes that there was nothing defamatory of him in the telecast and bases his entire complaint on the alleged invasion of his privacy. He concedes that his name was never mentioned, but contends that the physical resemblance of the actor who portrayed Dave Crouch to himself as he was twenty years before the telecast, and the similarities between the story of Dave Crouch with the facts of his own life, were such that his friends readily identified him as the person whose story was being portrayed.

Counsel further concedes that plaintiff's conviction and commutation of sentence, when they occurred, were matters in the public domain, and that a dramatization at that time based on the facts and containing nothing defamatory, similar to the program in question would not have been an invasion of plaintiff's privacy.[16] It is contended, however, that by reason of the lapse of time since plaintiff's release in 1940 and the non-public character of his activities since that date, his life has regained its private character, and he was in 1952 entitled to protection from any invasion of his privacy by revival of the story of his conviction and the subsequent proceedings, with consequent emotional distress to him and interference with his social and employment relations. Plaintiff argues that his past history has lost its news interest and is of no educational value, and that the prime purpose of the telecast of "The Big Story" was to sell Pall Mall cigarets by exploitation of his personal history.

Many points have been briefed and argued by counsel for the respective parties, but the case reduces itself to a few legal questions:

First, the law of what jurisdiction or jurisdictions is to be applied in resolving the other legal questions?

Second, can a public personage—to be specific, a person involved in a criminal trial—by virtue of the passage of time spent out of the public gaze, regain a private status so as to make his past legally protectible against invasion of privacy?

Third, do the facts alleged in plaintiff's complaints state a cause of action?

Fourth, is there any issue of material fact in this case which makes summary judgment inappropriate?

I

The confusion as to choice of law in actions for defamation and invasion of privacy arising from interstate publication is ably described by Dean Prosser at 51 Michigan Law Review 959.[17] He there discusses as possible choices: (1) the law of each place of "impact;" (2) the law of the first place of impact; (3) the law of the place of predominant impact; (4) the law of the place of defendant's act; (5) the law of defendant's principal place of business; (6) the law of the state of defendant's incorporation; (7) the law of the place of plaintiff's domicil; (8) the law of plaintiff's principal place of business; (9) "piecemeal law," or application of the law of different jurisdictions to different aspects of the case, such as liability, damages, effect of retraction, and so on; and (10) the law of the forum. The article cites cases illustrative of the various alternatives and points out the difficulties involved in applying each of them.

It is apparent to this court that the lumping of invasion of privacy with defamation leads to error in choice of

---

16. Tr., pp. 148–150.

17. See also "The Choice of Law in Multistate Defamation and Invasion of Privacy; An Unsolved Problem," 60 Harv.L. Rev. 941 (1947), and " 'Peace of Mind' in 48 Pieces v. Uniform Right of Privacy," by Frederick J. Ludwig, 32 Minn.L. Rev. 734 (1948). A reading of these articles raises the question of the desirability of enactment of a federal statute as incident to regulation of interstate radio and television broadcasts, or adoption of a uniform law by the states.

law, since determination of the law applicable to an action for invasion of privacy by interstate publication must depend upon a consideration of the nature of the tort itself, which differs materially from slander or libel.

■ As well stated in Reed v. Real Detective Publishing Co., 1945, 63 Ariz. 294, 295, 305–306, 162 P.2d 133, 139:

"The gravamen of the action * * * is the injury to the feelings of the plaintiff, the mental anguish and distress caused by the publication. * * * Unlike libel and slander, the gist of the cause is not injury to the character or reputation which appertains to the standing of a person in the eyes of others and are attributes in law separate from the 'person'. * * *

"Since, under the law, recovery may be had for an invasion of the right of privacy for injured feelings alone, the wrongs redressed must be considered as a direct rather than an indirect injury and one that is wholly personal in character, not depending on any effect which the publication may have on the standing of the individual in the community. It seems to us that the mind of an individual, his feelings and mental processes, are as much a part of his person as his observable physical members. An injury, therefore, which affects the sensibilities is equally an injury to the person as an injury to the body would be. In that respect a cause of action for the violation of the right of privacy, causing mental suffering to the plaintiff, is an injury to the person. Wyatt v. Hall's Portrait Studio, 71 Misc. 199, 128 N.Y.S. 247. * * * " 18

■■ The tort of invasion of privacy being a personal injury, the question whether plaintiff has a cause of action on the facts stated by him should be determined by the law of the jurisdiction where he sustained the injury,[19] or, as expressed in § 377 of the Restatement, Conflict of Laws (1934), "the state where the last event necessary to make an actor liable for an alleged tort takes place." The injury in these cases is the humiliation and outrage to plaintiff's feelings, resulting from the telecast. The last event necessary to make the defendant liable was not the final act in publication of the telecast, as plaintiff argues, but the reaction of the telecast on his own sensibilities.[20]

Thus, in Civil Action 3517–52, although the publication was set in motion in New York with the acting of the story and the transmission was completed in the District of Columbia by WNBW, the harm did not occur until the impact of the telecast upon plaintiff, in whatever

18. Warren and Brandeis, in their classic article, The Right to Privacy, 4 Harv.L. Rev. 192, 197, wrote: "Owing to the nature of the instruments by which privacy is invaded, the injury inflicted bears a superficial resemblance to the wrongs dealt with by the law of slander and of libel, while a legal remedy for such injury seems to involve the treatment of mere wounded feelings, as a substantive cause of action. The principle on which the law of defamation rests, covers, however, a radically different class of effects. * * * It deals only with damage to reputation, with the injury done to the individual in his external relations to the community, by lowering him in the estimation of his fellows * * * the effect of the publication upon his estimate of himself and upon his own feelings not forming an essential element in the cause of action. * * * "

19. Eastern Air Lines, Inc., v. Union Trust Co., D.C.Cir., 1955, 221 F.2d 62.

20. The Restatement, § 377, does not include in its illustrations an example of the place of infliction of mental suffering. The personal injury to the feelings of plaintiff, in Virginia or in the District of Columbia, inflicted by a telecast by defendant in New York or any of the other jurisdictions relaying the program, is analogous to physical injury to B in state Y, from a bullet fired by A in state X (place of wrong is Y), rather than akin to slander of the reputation of B, residing in state Y but known in state Z, by a broadcast by A in state X, heard by persons in Z conversant with B's good repute (place of the wrong is Z).

jurisdiction he may be considered to have had his situs. Similarly, in Civil Action 5663–52, although the program was broadcast "live" simultaneously in a number of different states on January 18, 1952, and by kineoscope recording on subsequent dates in other jurisdictions, the impact of all the broadcasts occurred in one place, the jurisdiction where plaintiff was when his feelings were wounded.

Whether the telecasts on the different dates constituted separate torts or whether each was a part of one alleged invasion of plaintiff's privacy, and whether plaintiff's privacy, once shattered on January 18, 1952, was susceptible of further invasion by the subsequent telecasts of the kineoscope recording, are academic questions. The impact on plaintiff's sensibilities on all of these occasions would have occurred in one and the same jurisdiction, since during the entire period of the original telecast and rebroadcasts plaintiff was domiciled and had his major contacts in the same places. If a tortious invasion of privacy be held to have occurred, damages for the injury to plaintiff's feelings would be assessed under the law of the one jurisdiction which is determined to have been his situs, but he could recover there for the whole amount of harm inflicted on his feelings, considering, among other factors, the extent of the publication or publications in that and other jurisdictions.

Plaintiff may be considered to have suffered humiliation either at the place of his domicil, which would be his normal situs, or, if at the time of the tort he was spending most of his time elsewhere, at the place of the most of his contacts. It has been admitted that plaintiff's domicil at the time of the telecast was Virginia,[21] where he maintained his family home, resided with his wife, paid taxes, and voted. Plaintiff argues that the greater number of his contacts were in the District of Columbia.[22] Conceding, for the purpose of this motion, that most of plaintiff's contacts were in the District and that this is the jurisdiction where he suffered the greatest impact on his feelings as the result of the telecast, and therefore the law of the District should be applied, it would make no difference in the court's disposition of the motion for summary judgment, as shown by the discussion under point III.

## II

As to the second question, whether a public person may, by the passage of time in private life, re-acquire a right of privacy as to his past life, there is a divergence of opinion.

The Restatement of the Law of Torts, § 867, summarizes the right of privacy very generally, stating:

"A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other."

The Restatement then notes that the protection accorded one's privacy is relative to the custom of the time and place and to the habits and occupation of the plaintiff, and that one must expect the ordinary incidents of community life of which he is a part. It points out that public figures must pay the price of unwelcome publicity and that those who unwillingly come into the public eye in connection with a criminal prosecution, innocent or guilty, are objects of legitimate public interest during a period of time after their conduct or misfortune has brought them to the public attention, and that "until they have reverted to the lawful and unexciting life led by the great bulk of the community, they are subject to the privilege which publish-

---

21. Tr., pp. 97, 98.

22. There is a conflict between plaintiff's deposition (p. 101) and his affidavit attesting the accuracy of the statement of facts (p. 13) in plaintiff's brief in opposition to the motion for summary judgment, as to whether he began looking for work in the District of Columbia in 1951 or 1952, that is, before the telecast or thereafter.

ers have to satisfy the curiosity of the public as to their leaders, heroes, villains and victims."

Several cases have been cited to the court which have dealt with the question whether time brings protection to a former public figure. Two in particular, which reach opposite conclusions, are relevant to the problem. In Sidis v. F. R. Pub. Corp., 2 Cir., 113 F.2d 806, 809, 138 A.L.R. 15, certiorari denied, 1940, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462, a former child prodigy, who had sought oblivion for many years, loathing public attention, claimed an invasion of his right of privacy by an unvarnished factual account in The New Yorker magazine of his life (using his name), including the many years which he had lived out of the public eye and touching on many personal details. It was there held by the federal court sitting in New York (a jurisdiction which has rejected the right of privacy as unrecognized at common law and has strictly interpreted its statute affording limited protection) that, although the plaintiff had dropped out of sight after 1910, "his subsequent history, containing as it did the answer to the question of whether or not he had fulfilled his early promise, was still a matter of public concern", and that the New Yorker sketch of the life of such an unusual personality possessed considerable popular news interest. The court there stated, 113 F.2d at page 809:

"* * * we would permit limited scrutiny of the 'private' life of any person who has achieved, or has had thrust upon him, the questionable and indefinable status of a 'public figure.' * * *

"* * * Regrettably or not, the misfortunes and frailties of neighbors and 'public figures' are subjects of considerable interest and discussion to the rest of the population. And when such are the mores of the community, it would be unwise for a court to bar their expression in the newspapers, books, and magazines of the day."

In Melvin v. Reid, 1931, 112 Cal.App. 285, 297 P. 91, 93, a reformed prostitute who had been tried and acquitted on a murder charge, sued for invasion of her privacy by a motion picture based on the facts of her past life, disclosing her former occupation, and using her true maiden name. After stating that the right of privacy does not exist as to public persons, in the dissemination of news and news events, in the discussion of events of the life of a person in whom the public has a rightful interest, or where the information would be of public benefit, and concluding that the mere use in the motion picture of incidents from the life of plaintiff, taken from the public records, was not actionable, the court said:

"One of the major objectives of society as it is now constituted, and of the administration of our penal system, is the rehabilitation of the fallen and the reformation of the criminal. Under these theories of sociology, it is our object to lift up and sustain the unfortunate rather than tear him down. Where a person has by his own efforts rehabilitated himself, we, as right-thinking members of society, should permit him to continue in the path of rectitude rather than throw him back into a life of shame or crime. Even the thief on the cross was permitted to repent during the hours of his final agony.

"We believe that the publication by respondents of the unsavory incidents in the past life of appellant after she had reformed, *coupled with her true name,* was not justified by any standard of morals or ethics known to us, and was a direct invasion of her inalienable right guaranteed to her by our [California] Constitution, to pursue and obtain happiness." (Emphasis supplied.)

In a third case, Mau v. Rio Grande Oil, Inc., D.C.Cal., 1939, 28 F.Supp. 845, the complaint was held to state a cause of action where it alleged that defendant had broadcast an advertising program

dramatizing a holdup and shooting in which plaintiff had been the victim, a year after the incident and using plaintiff's name without his consent, and that hearing the broadcast had caused plaintiff mental anguish, aggravated by telephone calls from sympathetic friends who also heard it and were desirous of rehashing the near-tragedy which plaintiff wished to forget.

It should be noted that in each of these cases the complainant was identified by name in the publication by defendant, as the plaintiff in this case was not in the telecast.

 This court agrees that we are not so uncivilized that the law permits, in the name of public interest, the unlimited and unwarranted revival by publication of a rehabilitated wrongdoer's past mistakes in such a manner as to identify him in his private setting with the old crime and hold him up to public scorn.[23] Persons formerly public, however, cannot be protected against disclosure and re-disclosure of known facts through the reading of old newspaper accounts and other publications, oral repetition of facts by those familiar with them, or reprinting of known facts of general interest, in a reasonable manner and for a legitimate purpose. The advocates of recognition of the right of privacy would not so extend it.[24] Public interest must be balanced against the individual's rights. Though fairness and decency dictate that some boundary be fixed beyond which persons may not go in pointing the finger of shame at those who have erred and repented, reasonable freedom of speech and press must be accorded and the fact of social intercourse must be recognized. Public identification of the present person with past facts, however, would constitute a new disclosure and, if unwarranted, would infringe upon an existing privacy. Thus, it would appear that the protection which time may bring to a formerly public figure is not against repetition of the facts which are already public property, but against unreasonable public identification of him in his present setting with the earlier incident.[25]

23. Plaintiff has submitted the affidavits of a number of persons interested and experienced in criminology who state, in substance, that no greater harm can be done to a man who has become rehabilitated after having been convicted of a criminal offense and demonstrated over a substantial period that he is fully rehabilitated, than to reveal his past criminal record in such a way as to bring it to the attention of his employer, fellow employees, neighbors, citizens of the community in which he lives and works, and the general public. With this general statement the court cannot disagree, but it is irrelevant to this case on the facts conceded by plaintiff.

24. "The right to privacy does not prohibit the communication of any matter which is of public or general interest. * * * It is the unwarranted invasion of individual privacy which is reprehended, and to be, so far as possible, prevented. * * * The general object in view is to protect the privacy of private life, and *to whatever degree and in whatever connection a man's life has ceased to be private, before the publication under consideration has been made, to that extent the* protection is to be withdrawn. * * *" Warren and Brandeis, The Right to Privacy, 4 Harv.L.Rev. 193, 214, 215. (Emphasis supplied.)

25. To hold otherwise leads to absurd results. For example, on the recent 75th Anniversary of one of Washington's large department stores, the window displays, containing costumes of various years since the store's establishment, featured reprints of front pages from Washington newspapers of each year. If one of these chanced to contain a report of an old crime, giving the names of the criminal and his victim, should it be said that the publication constitutes an actionable invasion of their privacy? Similarly, should any person whose name appears in one of the reproductions of old newspaper mats which permanently decorate the National Press Club walls, be permitted, after an interval of private life, to complain that maintenance of that wall decoration constitutes an invasion of his privacy? Should old newspaper files be withheld from the public after a certain period of time, lest persons not aware of past public facts learn of them in the future? Should reprints of old legal

Determination of this question is not, however, essential to disposition of the present motion. Assuming *arguendo* that at the time of the telecast plaintiff had regained a private status carrying with it legal protection from republication of the facts of his past life, the complaints, as supplemented by plaintiff's deposition and the various admissions, stipulations, and answers to interrogatories by the respective parties, do not state a valid cause of action.

### III

As concluded under point I, the two jurisdictions which might be deemed the place of plaintiff's injury and therefore held to govern his right of action, are Virginia and the District of Columbia.

■ The Virginia Code, 1950 ed., Vol. 2, provides:

"§ 8–650. UNAUTHORIZED USE OF THE NAME OR PICTURE OF ANY PERSON. A person, firm, or corporation that knowingly uses for advertising purposes, or for the purposes of trade, the name, portrait, or picture of any person resident in the State, without having first obtained the written consent of such person, or if dead, of his surviving consort, or if none, his next of kin, or, if a minor, of his or her parent or guardian, as well as that of such minor, shall be deemed guilty of a misdemeanor and be fined not less than fifty nor more than one thousand dollars. Any person whose name, portrait, or picture is used within this State for advertising purposes or for the purposes of trade, without such written consent first obtained or the surviving consort or next of kin, as the case may be, may maintain a suit in equity against the person, firm, or corporation so using such person's name,

portrait, or picture to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use. And if the defendant shall have knowingly used such person's name, portrait, or picture in such manner as is forbidden or declared to be unlawful by this chapter, the jury, in its discretion, may award exemplary damages. (Code 1919, § 5782.)"

No reported Virginia cases interpreting this statute have been cited to the court, nor has the court found any. It is apparent from a reading of § 8–650 that the right of action accorded is limited. The statute is modeled on the New York law,[26] discussed fully in the opinions in Gautier v. Pro-Football, Inc., 278 App.Div. 431, 106 N.Y.S.2d 553, affirmed 304 N.Y. 354, 107 N.E.2d 485, which cite many cases interpreting the law in connection with various phases of the right of privacy. Suffice it to say, the New York statute has been given a strict construction. Publication of "biographical narratives of a man's life when it is of legitimate public interest, and 'travel stories, stories of distant places, tales of historic personages and events, the reproduction of items of past news, and surveys of social conditions'" are generally considered beyond the purview of the statute. This principle has been extended to the newsreel, the radio, and television.[27]

It is patent that the television program here involved does not fall within the language or purpose of § 8–650 of the Virginia Code.

■ Whether a right of action for invasion of privacy exists in the District of Columbia has not been authoritatively determined. The history of the right of privacy in other jurisdictions is set forth

decisions omit names after a number of years have passed? To state these questions is to make the answer obvious.

26. Chaplin v. National Broadcasting Co., D.C.N.Y.1953, 15 F.R.D. 134, 138.

27. Gautier v. Pro-Football, Inc., 106 N.Y.S. 2d 553, at 558, citing Lahiri v. Daily Mirror, Inc., 162 Misc. 776, 782, 295 N.Y.S. 382, 388, and Jeffries v. New York Evening Journal Pub. Co., 67 Misc. 570, 124 N.Y.S. 780.

in Judge Holtzoff's opinion in Peay v. Curtis Publishing Company, D.C.D.C. 1948, 78 F.Supp. 305.

Almost thirty years ago, in Peed v. Washington Times Company, 55 W.L.R. 182, Mr. Justice Siddons recognized the right of privacy as within the constitutional guarantee of personal liberty and security.[28] The constitutional approach to the right of privacy has been criticized by a number of writers on the ground that the individual liberties guaranteed are rights of the citizen against the government, not of individual against individual. This is a logical criticism. Nevertheless, the recognition of the right of privacy harmonizes with the concept of the rights of the individual in a free society embodied in our Constitution.[29]

The right of privacy was recognized by Judge Holtzoff of this Court in the Peay case, supra, as a modern adaptation of the common law.[30] Judge Pine, however, in Elmhurst v. Shoreham Hotel, D.C. D.C.1945, 58 F.Supp. 484, held that the tort of invasion of the right of privacy was unknown at common law and therefore could not be recognized in the District of Columbia, by reason of § 49–301 of the District of Columbia Code, 1951 Ed., 31 Stat. 1189, which continued in effect in the District the common law, both civil and criminal, in force in Maryland in 1801, except insofar as it is inconsistent with or replaced by subsequent legislation of Congress. The Court of Appeals affirmed the Elmhurst decision, Elmhurst v. Pearson, 1946, 80 U.S.App. D.C. 372, 153 F.2d 467, on the ground

28. Mr. Justice Siddons there wrote: "It is true that our Federal Constitution contains no express recognition of the inalienable right to the pursuit of happiness, so affirmed in the Declaration [of Independence]. It does, however, safeguard the life, liberty and property of the citizen." The opinion quotes from numerous Supreme Court decisions bearing on the concept of liberty, among them the following from Interstate Commerce Commission v. Brimson, 1894, 154 U.S. 447, 479, 14 S.Ct. 1125, 38 L.Ed. 1047: "We said in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746,—and it cannot be too often repeated—that the principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employees of the sanctity of a man's home, and the privacies of his life. As said by Mr. Justice Field in In re Pacific Railway Commission, C.C., 32 F. 241, 250, 'of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all others would lose half their value."

29. In connection with search and seizure, the Supreme Court has often referred to the individual's right of privacy. See McDonald v. United States, 1948, 335 U.S.

451, 69 S.Ct. 191, 93 L.Ed. 153; Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663; Johnson v. United States, 1948, 333 U.S. 10, 68 S. Ct. 367, 92 L.Ed. 436; Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Davis v. United States, 1946, 328 U.S. 582, 66 S.Ct. 1256, 90 L. Ed. 1453.

30. Judge Holtzoff there wrote, 78 F.Supp. at page 309:
"It has been said that the right of privacy was originally unknown at common law. This may well be true. It is a mistake to assume, however, that the common law became petrified and static and is no longer subject to modification except at the hands of the Legislature. An examination of the course of judicial decisions on numerous topics will demonstrate the contrary. The common law is always in a state of flux and is constantly molded and adjusted to meet changing conditions. * * * Modern life with its accompanying increase in public media of communication, such as newspapers, monthly and weekly magazines, moving pictures, radio, and television, has created novel situations, that in turn gave rise to the problem of protecting the individual who desires seclusion and freedom from intrusion into his private life as well as from undue and undesirable publicity, such as is involved in the circulation of his likeness without his permission. * * The law has recognized the right of privacy. * * *"

that the right of privacy does not include protection from publication of matters of legitimate public or general interest, hence the broadcast there complained of was not actionable; but that Court specifically left undecided whether an action for invasion of privacy can be maintained in the District of Columbia.

The purpose of Warren and Brandeis in *The Right to Privacy*, supra, was "to consider whether the *existing law* affords a principle which can properly be invoked to protect the privacy of the individual; and, if it does, what the nature and extent of such protection is." (At 197.) After examination of English cases affording redress for publication of diaries or private letters or drawings and prohibiting publication of even a description of their contents, the authors concluded that privacy was the true interest which formerly was given protection by the common law in the guise of various other conventional legal interests, and they recommended that the right to one's personality and the remedy for invasion of privacy be recognized for what they really are. The reasoning of Warren and Brandeis is less open to attack, and to it this court subscribes.

Other courts have traced the right of privacy to natural law.[31]

Whether the right to protection of one's privacy be viewed as stemming from natural law, as a constitutional right, or as a right which was afforded protection under the common law, though not by name, § 49–301 of the District Code does not preclude recognition in the District of Columbia of a common-law action for invasion of privacy.

 What are the elements of such a common law action? Invasion of privacy has been summarized in the exhaustive annotation appearing at 138 A.L.R. 22, at 25 (supplemented at 168 A.L.R. 446 and 14 A.L.R.2d 750) as:

"The *unwarranted* appropriation or exploitation of one's personality, the publicising of one's private affairs with which the public has no *legitimate* concern, or the *wrongful* intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." (Emphasis supplied.)

Under this definition, which embodies the minimum requirements of the many cases there noted, the essential elements of an action for invasion of privacy would be: (1) private affairs in which the public has no legitimate concern; (2) publication of such affairs; (3) unwarranted publication, that is, absence of any waiver or privilege authorizing it; and (4) publication such as would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. As to the first element, the "private" affairs should be at least currently unknown to the public; and as to the second element, publication would necessarily include identification of the facts disclosed with the complainant. The third element, a mixed question of fact and law, and the fourth element, a fact question for the jury, need not be reached if either of the first two elements is not present.

On the undisputed facts disclosed by the various pleadings and admissions before the court on this motion, it is clear that the first two essential elements of a cause of action are lacking in the case at bar.

(1) The plaintiff's affairs were not private and were known to the public. His case had been given considerable publicity from the time of his trial in 1932 until his conditional release from imprisonment in 1940. Newspaper files at all times contained the story of his

31. Voelker v. Tyndall, 1947, 226 Ind. 43, 75 N.E.2d 548; McGovern v. Van Riper, 1945, 137 N.J.Eq. 24, 43 A.2d 514, affirmed, 1946, 137 N.J.Eq. 548, 45 A.2d 842; Pavesich v. New England Mutual Life Ins. Co., 1905, 122 Ga. 190, 50 S.E. 68.

conviction and the subsequent proceedings, including plaintiff's past record and the failure to call his "common-law wife" as a witness at the trial.[32] The Court of Appeals' decision affirming the conviction, printed in both the Reports of Cases Adjudged in the United States Court of Appeals for the District of Columbia and in the Federal Reporter, Second Series, reveals that the man who gave his name as Charles Harris at the time of his arrest subsequently gave the name Charles Bernstein to a detective and in his motion for a new trial. These volumes have been on many library shelves and available to all since 1934. About 1936 or 1937 a detective story magazine article on plaintiff's case was published.[33] In 1948, a radio play, a fictionalized version of the case, using the name of Martha Strayer, was broadcast.[34]

(2) The admitted facts show there was no publication by defendant of the

program as the plaintiff's prior history. Not only was there no identification of plaintiff by name in either the telecast or defendant's advertisements thereof, but he was doubly insulated from identification by designation of the television character as "Dave Crouch" and his own trial as "Charles Harris." Except to one already familiar with the facts or one who had stumbled on the reported court decision or the old newspaper items, there was nothing to link Charles Harris with any Charles Bernstein, much less plaintiff. To one who viewed the telecast not already aware of plaintiff's past or Miss Strayer's connection with him, the only link between Dave Crouch and Charles S. Bernstein of Front Royal, Virginia, and the District of Columbia was the alleged physical resemblance of the actor to the Charles Bernstein of *twenty years before*.[35] This is too tenuous a thread on which to permit a jury to hang identification, with consequent liability for invasion of privacy.[36]

32. Tr., pp. 117–118.

33. Plaintiff's deposition, pp. 116–117.

34. Plaintiff's deposition, pp. 138–139; Tr., pp. 173, 181–184.

35. If taken literally, the court finds incredible plaintiff's statement ("Answer of Plaintiff to Information Requested by Defendant," filed December 10, 1954) that seventeen named persons in Washington, Front Royal, and Philadelphia, who had no knowledge of his past life, "as a result of the telecast" identified plaintiff as the person whose life story was portrayed. If plaintiff means that as the result of the telecast third persons who knew the basis of the television play identified him to the named persons, this is credible; but it is not the basis of an action against the defendant. See Tr., pp. 169–170.

36. In Melvin v. Reid, supra, the case which on its facts is most analogous to the case at bar, the court held, 112 Cal. App. at pages 290–291, 297 P. at page 93:

"* * * the use of the incidents from the life of appellant in the moving picture is in itself not actionable. These incidents appeared in the records of her trial for murder, which is a public record, open to the perusal of all. The very

fact that they were contained in a public record is sufficient to negative the idea that their publication was a violation of a right of privacy. When the incidents of a life are so public as to be spread upon a public record, they come within the knowledge and into the possession of the public and cease to be private. Had respondents, in the story of 'The Red Kimono,' stopped with the use of those incidents from the life of appellant which were spread upon the record of her trial, no right of action would have accrued. They went further, and in the formation of the plot used the true maiden name of appellant. If any right of action exists, it arises from the use of this true name in connection with the true incidents from her life together with their advertisements in which they stated that the story of the picture was taken from true incidents in the life of Gabrielle Darley, who was Gabrielle Darley Melvin."

In Toscani v. Hersey, 271 App.Div. 445, 65 N.Y.S.2d 814, 817, it was held that a work of fiction based on the life of an officer of the American military government, where a fictitious name was given the leading character and no picture or likeness of plaintiff was used, did not constitute a "portrait or picture" of plaintiff used for trade purposes within contemplation of the New York statute,

Plaintiff argues there were three categories of people as to whom there was identification: first, those who knew about the incidents of plaintiff's past life; second, those who remembered the newspaper articles twenty years before and were able to connect them with the broadcast; and third, those who did not know of Mr. Bernstein's past life but, as the result of the telecast, learned about it "because they were told by other people." [37]

As to persons who already knew the facts of plaintiff's life there was no invasion of plaintiff's privacy by defendant. Although the telecast may have revived their memories, it revealed nothing they did not already know. The gist of an action for invasion of privacy is a wrongful disclosure *by the defendant*. The identification of plaintiff to viewers of the telecast was not by act of the defendant, but by use of their own thought processes. If these people were so thoughtless as to harass plaintiff with calls, as he contends, such harassment was the product of their own deduction and lack of tact and consideration for plaintiff. Persons who recalled the newspaper articles and connected them with plaintiff are indistinguishable from the first group, for the identification to them was through their own mental operations.[38]

As to the third category, those who did not know of Mr. Bernstein's past life but, as the result of the telecast, learned about it "because they were told by other people," counsel for plaintiff very frankly admitted, "We are right in the open spaces." He cited in support of his position a number of cases holding that the author of a defamation is responsible for its repetition by another if the defamation is uttered or published under such circumstances as to time, place, and condition that a repetition or secondary publication is the natural and probable consequence of the original defamation, and for the damage resulting therefrom. The rule varies in different jurisdictions.[39]

Civil Rights Law, McK.Consol.Laws, c. 6, §§ 50, 51.

37. Tr., pp. 169–170.

38. Plaintiff has cited to the court many cases involving slander or libel in which it was held that the author of a defamatory statement is liable for damage to the reputation of complainant, even though the latter was not named, if reasonable people knowing some of the circumstances would take the libel complained of to relate to complainant. It is to be remembered that the gist of an action for defamation is the damage to complainant's reputation in the eyes of third persons. It is therefore unimportant whether the identification was completed or merely set in motion by the author of the defamatory statement; whereas in an action for invasion of privacy the gist of the action is the damage to plaintiff's feelings resulting from a wrongful disclosure by defendant. The one invasion of privacy case cited on this point is Walcher v. Loew's, Inc., D.C.Mo., 1948, 129 F.Supp. 815, in which plaintiff, a former Army nurse stationed on Corregidor, sued defendant for damages resulting from exhibition of the motion picture "They Were Expendable," which had been publicized widely, both in book and picture form, as based on the true experiences of actual people, although fictitious names were used. Included was the story of a romantic attachment of an Army nurse for a Naval lieutenant. This case is distinguishable on its facts from the case at bar. There, plaintiff alleged the picture was released for exhibition *after* she had become identified and known to the general public as the character portrayed in the book, and the affairs alleged to have been disclosed were of an inherently private nature. In this case, it is alleged that identification was made by persons who viewed the program in the light of their own knowledge of plaintiff's life, and the affairs alleged to have been disclosed were matters of public record.

39. Mattox v. News Syndicate Co., 2 Cir., 1949, 176 F.2d 897. The District of Columbia formula is given in Washington Herald Co. v. Berry, 1914, 41 App. D.C. 322, and Washington Times Co. v. Downey, 1905, 26 App.D.C. 258, as the fair financial equivalent of the detraction from plaintiff's reputation in the community, considering the nature of the article, the circulation of the paper, and the distress and humiliation suffered by the plaintiff.

**834**

But in defamation, there can, of course, be no repetition of a defamatory statement unless the statement is first made. Hence, none of the cited cases deal with an attempt to remedy the absence of proof of publication by defendant, an essential element, by proof of repetition of the statement by third persons. Similarly, in invasion of privacy, where defendant has published facts in such a way that there has been no disclosure to persons not already aware of them, proof of disclosure or identification by third persons to others who lacked prior knowledge cannot be used as a substitute for proof of original disclosure by defendant. In estimating the extent of the injury caused by an invasion of privacy, as in assessing damages for defamation, foreseeable repetition by third persons to whom the defendant disclosed plaintiff's private affairs is a factor to be considered. But such evidence is admissible only on the issue of damages, after proof of commission of the tort by the defendant.

The identification by third persons who communicated their own knowledge of the facts on which "The Big Story" was based, would be an original publication by them, for which they—not defendant—would be liable, if such disclosure be wrongful. The same is true of the alleged identification of plaintiff by virtue of the news item in the Washington Daily News of January 18, 1952.[40] If there was identification by the News, the defendant is not chargeable with the act of the newspaper company.[41] The court holds there are no facts on which the court could permit a jury to find identification by defendant, assuming every allegation by plaintiff to be true.

(3) Plaintiff argues that privilege as to one publication or consent to disclosure for one purpose does not constitute privilege or waiver of privacy as to all publications, citing a number of cases,[42] and therefore the fact that the public records were privileged or that plaintiff may have approved the newspaper campaign on his behalf from 1934 to 1940 and not objected to the magazine article of 1936 or 1937 or the radio program of 1948, did not authorize the telecast. Plaintiff further argues that prior wrongful publications cannot make a further wrongful publication legal.

Both general statements are correct. Quoting again from Warren and Brandeis, at page 217 of their article:

" * * * The right to privacy ceases upon the publication of the facts by the individual, or with his consent.

"This is but another application of the rule which has become familiar in the law of literary and artistic property. The cases there decided establish also what should be deemed a publication,—the important principle in this connection being that a private communication or circulation for a restricted purpose is not a publication within the meaning of the law."

Privilege or waiver as to a prior disclosure is relevant, therefore, insofar as it relates to the issue whether there was a limited disclosure for a particular purpose or whether the facts became public property. The same is true of any prior disclosure which was not consented to and not privileged. Certain affairs of the individual are inherently private, and wrongful publication of them could not authorize subsequent publicity.[43] In

40. Plaintiff's deposition, pp. 133, 140; Tr., p. 136.

41. One news item in one paper on the day of the telecast cannot be held a basis for finding general public identification prior to defendant's telecast, such as was alleged in the Walcher case, supra.

42. Those relevant to the issue are: Melvin v. Reid, supra; Mau v. Rio Grande Oil Co., supra; Leverton v. Curtis Publishing Co., 3 Cir., 1951, 192 F.2d 974.

43. For example, the facts of the romance of a private person, disclosure of which

the final analysis, whether disclosed facts are to be held public property depends upon a weighing of all the factors in favor of the free circulation of information against the individual's desire to avoid notoriety.

Plaintiff, having conceded that the story of his conviction and pardon were public property at the time they occurred, argues that since the matter had lain dormant from 1940 until 1952, a period of twelve years, it had become "stale news." In view of the radio publication in 1948, plaintiff's affairs had, on his own admission, been out of the public eye only since 1948 or for four years preceding the defendant's telecast. Plaintiff's counsel did not attempt to draw a line as to when matters of current interest become "stale news." Although news value is one of the bases for the privilege to publish, this court prefers the broader test of "public or general interest," advocated by Warren and Brandeis, supra, at 214. This court holds, as a matter of law, that a criminal proceeding widely publicized for a period of at least eight years and containing elements of decided popular appeal does not lose its general public interest in a period of four years or even twelve years; [44] hence, republication in a reasonable manner was privileged.

(4) Since it has been concluded that the facts of plaintiff's past life were not private affairs and that there was no invasion of plaintiff's privacy by defendant, it is not necessary to disposition of the motion to determine whether the publication was in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities, which plaintiff urges as an unresolved material issue of fact on which reasonable men might differ. Otherwise, despite the affidavits in support of plaintiff's opposition to the motion stating the reaction of third persons to defendant's telecast, this court would be inclined to rule, as a matter of law, that the telecast was not offensive to one of ordinary sensibilities in plaintiff's position.[45]

The program of January 18, 1952, although sponsored commercially,[46] was one of general interest. It did not single out plaintiff to expose him to public scorn, but was one of a series of television plays devoted to retelling in fictionalized form the stories of newspaper reporters who had done excellent work in promoting justice. As the New Yorker sketch in the Sidis case, supra, might be of current public value in pointing out to parents the unhappy results of forcing a child prodigy into public notoriety, "The Big Story" program was of current public value in demonstrating how an alert reporter, who has an interest in seeing the right prevail, may help an innocent man escape the unhappy consequences of a wrongful conviction, and perhaps might inspire some other reporter to greater efforts or some young person to embrace a newspaper career. There was a careful and honest attempt

was alleged in the Walcher case, supra, would not become public property through a wrongful disclosure.

44. This is obvious to anyone familiar with popular compendiums of old crimes, detective stories based on fact, and the more lurid Sunday newspaper supplements.

45. Plaintiff's counsel in his argument of the motion (Tr., p. 119) argued that disclosure of the so-called common-law marital relationship was an invasion of plaintiff's right of privacy for two reasons: "(1) It could be clearly offensive to a substantial segment of the population to know that there was a common-law mari-

tal relationship that one time existed. (2) It is important also because the disclosure of that fact caused mental distress, and so forth, to my client." It is to be emphasized that the reaction of third persons is not pertinent. It is the outrage, mental suffering, shame, or humiliation of a normal person in plaintiff's position which governs.

46. Plaintiff's counsel (Tr., pp. 153, 156) conceded in his argument that the right to be let alone does not depend upon whether there is commercial use of the publication or not. Garner v. Triangle Publications, Inc., D.C.N.Y.1951, 97 F. Supp. 546.

to conceal the identity of all persons save the reporter, and the facts of the case were sufficiently changed to avoid duplication of the actual proceeding. That the concealment of plaintiff's identity was accomplished is attested by plaintiff's own allegations showing that only those who knew the story recognized it. The convicted man was shown as an entirely sympathetic character, innocent, wrongfully accused, inadequately defended, convicted on flimsy evidence, and saved from a gross miscarriage of justice in the nick of time. The picture painted was more favorable than the facts of record.[47] If plaintiff had wished to publicize his innocence to those who knew of his conviction but had never heard of his pardon, he could have chosen no more effective means than a popular nation-wide television network program.

If anyone's sensibilities should have been wounded by the play, it was the judge, the detectives, and the trial counsel, whose parts were given such unsympathetic treatment as to be defamatory, had there been identification. The whole atmosphere of the trial, as portrayed in the telecast, was not such as to inspire viewers with confidence in the administration of justice in the District of Columbia.

### IV

Plaintiff's counsel, having agreed at a lengthy pre-trial conference held when the case was referred to this court for trial, that it is a proper one for summary judgment, no material issue of fact being presented and the outcome depending upon the determination of questions of law, has included in his opposition to the motion for summary judgment a lengthy list of issues of fact which he now conceives to exist and deems material.

These deal, in general, with the place and method of publication of the telecast by defendant; the principal place of publication; plaintiff's domicil; whether plaintiff was looking for work in Washington at the time of the telecast; whether the telecast was based upon facts disclosed by public records, newspapers, by plaintiff, or by others with his consent; whether plaintiff consented to prior disclosures; whether the program is properly identified by defendant as "The Story of Martha Strayer;" whether the program was offensive to persons of ordinary sensibilities and in no way beyond the limitations of decency; whether the disclosure of a common-law relationship would be offensive to the ordinary person; whether this relationship was objectionably handled; whether plaintiff had succeeded in forgetting his experience; the psychological soundness or desirability of "burying" an actual experience; and whether the advertising agency and producer of the "package" program were independent contractors, leasing television time, so as to insulate NBC from liability for the telecast.

In view of the court's determination on choice of law, the place and method of publication of the telecast by defendant are not material to existence of a cause of action. It has been conceded by plaintiff that his domicil was Virginia at the time of the telecast;[48] and the court has assumed for the purpose of the motion that plaintiff was looking for work in Washington at the time of the telecast. Plaintiff has conceded that it makes little difference in the matter of liability whether the script was based on public records, newspapers, or disclosures made with the consent of plaintiff.[49] The court having determined that the facts alleged to have been disclosed were matters of general public

---

47. For example, only one prior difficulty with the law was mentioned, the offense for which Crouch received a pardon in Minnesota. Helen Slezak was referred to as Crouch's "common-law wife" although there could be no valid common-

law relationship under the facts of the story or of plaintiff's liaison.

48. Transcript of argument, pp. 97, 98.

49. Tr., p. 116.

interest, it is immaterial whether plaintiff consentèd to their disclosure. In the absence of privacy and invasion thereof by defendant, the other fact issues listed àre also immaterial.

In his supplemental memorandum in opposition to the motion for summary judgment, counsel for plaintiff states there is an issue of fact as to how far the program comported with reality. In the case at bar, on the agreed facts, the answer to this question would not affect the end result. If the telecast adhered to the facts, plaintiff has no cause of action, for there was no actionable invasion of his privacy by use of incidents in his life without identification.[50] If the telecast was more fiction than fact, plaintiff cannot complain, for there was no identification of him as the central figure by defendant and nothing defamatory.

The court therefore holds that there is no genuine issue of fact material to plaintiff's cause of action and that the case is ripe for summary judgment.

From a review of the many reported decisions involving invasion of privacy, the court concludes that the determination of whether a publication was permissible in the interest of the free dissemination of information or whether it so exceeded the bounds of decency as to invade the individual's privacy depends upon the particular fact situation, and in some cases presents a fact question for the jury. None of the cases is on all fours with the case at bar, which may be regarded as a hybrid containing some of the elements present in Melvin v. Reid, and the Mau, Toscani, and Walcher cases, but lacking essential factors of each. The court holds, as a matter of law, that the facts in this case present no actionable invasion of plaintiff's privacy by defendant.

For the foregoing reasons, the court will grant defendant's motion for summary judgment. Counsel will present promptly an appropriate order.