Arsene Gautier, Respondent, v. Pro-Football, Inc., Defendant, and American Broadcasting Co., Inc., et al., Appellants.

First Department, June 29, 1951.

*Walter R. Barry* of counsel (*Coudert Brothers,* attorneys), for appellants.

*Harold M. Goldblatt* of counsel (*Louis P. Randell,* attorney), for respondent.

SHIENTAG, J. Plaintiff brings this action alleging that defendants, without authorization, used his name and picture for advertising purposes and purposes of trade in violation of section 51 of the Civil Rights Law. Plaintiff received a judgment of $500 which was unanimously affirmed by the Appellate Term. By permission of this court, defendants have appealed from the determination of the Appellate Term.

Plaintiff is a well-known showman and performer who produces and presents acts with trained ponies, dogs and monkeys. On December 5, 1948, the plaintiff performed his act at Griffith Stadium, Washington, D. C., as part of the entertainment pro-

vided between the halves of a professional football game. The plaintiff's act was televised at that time by the defendant American Broadcasting Company [hereinafter called " ABC "] and was viewed on an estimated 17,000 television sets in the New York area. Plaintiff's name was concededly used in connection with the telecast. Commercial announcements were made both prior and subsequent to the telecast of plaintiff's act.

Plaintiff performed pursuant to a contract entered into with Pro-Football, Inc., an unserved defendant and the owner of the Washington professional football team. The contract is a standard form contract of the American Guild of Variety Artists, one paragraph of which provides that the artist shall not be requested to appear in television without first securing the written consent and approval thereto of the guild.

The defendant ABC had contracted with the New York professional football team to televise its home games. Defendant Newell-Emmett Company, an advertising agency, arranged with ABC for sponsorship of the games by defendant Liggett & Myers Tobacco Company, manufacturer of Chesterfield cigarettes.

Under its contract with ABC, the New York team agreed to use its best efforts to obtain television rights of games played by other teams on days when the New York team was playing out of town. On the date in question, ABC had secured permission from Pro-Football, Inc., from the owners of the Washington television station and from the commissioner of the National Football League to televise the Washington game. No formal contract was apparently entered into between ABC and these parties, nor between plaintiff and the served defendants.

One clause in ABC's contract with the New York professional football team expressly provided that the " right to telecast the games shall include the right to telecast any other events taking place in the intermission or as part of the presentation of the game ". The record does not indicate whether this right was explicitly or implicitly incorporated in the permission given for the telecast of the Washington game, so we must consider this case apart from the effect, if any, which such contract arrangement might have on plaintiff's or defendants' rights.

The plaintiff testified that ABC's announcer had informed him prior to the game that his act was to be televised and that he then objected. The announcer contradicted this statement. The lower court, however, found as a fact that the plaintiff had made formal objection to use of his name and picture, and there

is ample evidence to support that finding. We also accept the conclusion of the lower court that New York law is applicable under the facts of this case.

Section 51 of the Civil Rights Law, on which plaintiff grounds his cause of action, provides: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use".

The cases decided in the almost fifty years since the enactment of this statute have established certain guide posts for the application of the broad language of the statute. Claims based on use of a name or a picture "for advertising purposes", for example, have received much more liberal treatment than those grounded on use "for purposes of trade."

The difference in approach is not without reason. The compelling public interest in the free flow of ideas in the market place does not extend to advertising matter. Therefore, the unauthorized use of a person's name or picture in direct connection with and as part of advertising matter has almost uniformly been held actionable. Perhaps the only exception to this rule occurs in the incidental mention of a name in commentary within paid advertising space, but unrelated to the advertiser's product or business. (*Wallach* v. *Bacharach*, 192 Misc. 979, affd. 274 App. Div. 919; see 49 Col. L. Rev. 282.)

Plaintiff argues that the use of his name and picture in a sponsored telecast constituted, *ipso facto*, a use "for advertising purposes." We cannot agree. True, the cases have established well nigh absolute liability where, for example, the plaintiff's name or photograph appeared within the boundaries of a newspaper advertisement. (See *Lahiri* v. *Daily Mirror*, 162 Misc. 776, 782.) But advertising in newspapers is physically segregated from the editorial, news and feature columns, and visual inspection suffices to determine whether a name is used in connection with advertising.

The unique economic necessities of radio and television, however, require that, in large part, programs appear under the sponsorship of commercial advertisers. To hold that the mere fact of sponsorship makes the unauthorized use of an individual's name or picture on radio or television a use "for adver-

tising purposes '' would materially weaken the informative and educational potentials of these still developing media. We hold, therefore, that in the absence of exploitation of a name or picture in the commercial announcement or in direct connection with the product itself, there is no use '' for advertising purposes.'' (See *King* v. *Winchell,* 248 App. Div. 809.) As the record makes clear that there was here no such exploitation of plaintiff's name or picture, plaintiff cannot recover under this aspect of the Civil Rights Law.

A more difficult question is presented, however, in determining whether the present use was '' for the purposes of trade.'' In defining this phrase, the cases have established categories of immunity and liability. Cognizant of the overriding social interest in the dissemination of news, an almost absolute privilege has been extended to the use of names and pictures in connection with the reportage of news. Use of a name or photograph is granted immunity whether it appears in a newspaper (*Binns* v. *Vitagraph Co.,* 210 N. Y. 51, 56) ; a newsreel (*Humiston* v. *Universal Film Mfg. Co.,* 189 App. Div. 467) ; a magazine (*Sidis* v. *F-R Pub. Corp.,* 113 F. 2d 806, certiorari denied, 311 U. S. 711) ; or even a comic book (*Molony* v. *Boy Comics Publishers,* 277 App. Div. 166). Once an item has achieved the status of newsworthiness, it retains that status even when no longer current (*Molony* v. *Boy Comics Publishers, supra,* p. 170; *Sidis* v. *F-R Pub. Corp., supra*). Moreover, courts will not undertake the dangerous task of passing value judgments on the content of the news (*Humiston* v. *Universal Film Mfg. Co., supra,* p. 474). The deliberation of the United Nations and the chit-chat of a society editor receive equally the protection of the privilege (see *Molony* v. *Boy Comics Publishers, supra,* pp. 170–171).

There are, of course, limits. The use of the name or photograph must have some relevance to the reporting of news (*Thompson* v. *Close-Up, Inc.,* 277 App. Div. 848). And the name must not be used in a context that outrages the community's notions of decency (*Sidis* v. *F-R Pub. Corp., supra*).

Conversely, courts have been unwilling to accord protection to fiction or fictionalized treatment of news (*Binns* v. *Vitagraph Co.,* 210 N. Y. 51, *supra*; *Blumenthal* v. *Picture Classics,* 235 App. Div. 570, affd. 261 N. Y. 504; *Sutton* v. *Hearst Corp.,* 277 App Div. 155). This is undoubtedly bottomed on a belief that fiction performs a relatively less significant function in the dissemination of information to the public. While this principle

has been questioned (*Winters* v. *New York,* 333 U. S. 507, 510), it seems established in the jurisprudence of this State.

Between these two extremes of news and fiction lies a vast middle ground which is neither one nor the other. In determining whether recovery should be granted in such cases, no hard and fast rules can be laid down — at any rate not at this stage of the development of the law on the subject. Necessarily, each case must be decided on a weighing of conflicting policies: the public interest in free dissemination of information against the interest in the preservation of the inviolate personality. Among the relevant factors in such decision are the media used, the nature of the subject matter and the extent of the actual invasion of privacy.

In a medium, such as a newspaper, which performs a traditional function of news dissemination, courts are chary of circumscribing too nicely the protected areas. Articles such as biographical narratives of a man's life when it is of legitimate public interest, and '' travel stories, stories of distant places, tales of historic personages and events, the reproduction of items of past news, and surveys of social conditions '' will generally be considered beyond the purview of the statute (see *Lahiri* v. *Daily Mirror,* 162 Misc. 776, 782, *supra,* and *Jeffries* v. *New York Evening Journal Pub. Co.,* 67 Misc. 570). In the main, this principle extends to the newsreel, the radio and to television.

Where, however, the subject matter is solely for entertainment purposes and particularly where it appears in a medium not identified, in the main, with dissemination of news, recovery will be more freely permitted. In *Redmond* v. *Columbia Pictures Corp.* (277 N. Y. 707), for example, plaintiff, a professional golfer and trick shot artist, gave, without compensation, a private exhibition of trick shots for the Fox Movietone News. Fox exhibited the film as part of a newsreel. Thereafter, the defendant purchased the film from Fox and incorporated it into a short, humorous feature film entitled '' Golfing Rhythm ''. A verdict for the plaintiff was upheld by this court and the Court of Appeals (see, also, *Franklin* v. *Columbia Pictures Corp.,* 246 App. Div. 35, affd. 271 N. Y. 554).

Recovery was, however, denied in *Colyer* v. *Fox Pub. Co.* (162 App. Div. 297). There, the *Police Gazette* published without authorization a picture of the plaintiff, a professional high diver, together with four other pictures of women vaudeville performers. The caption read '' Five of a Kind on This Page.

Most of Them Adorn the Burlesque Stage, All of Them are
Favorites with the Bald Headed Boys." The court held that
" the statute has not been so far extended as to prohibit * * *
publication in a * * * periodical paper or magazine of the
portrait of an individual " (162 App. Div. 300).

It has been indicated that the broadcast of a parade or a
sporting event, such as a football game, would be placed outside
the statute (*Humiston* v. *Universal Film Mfg. Co.,* 189 App.
Div. 467, 473, *supra*).

The present case falls into this indeterminate category that
is neither news nor fiction. It becomes necessary then to
examine the particular facts before us to determine whether
the privilege accorded to news and matters of public interest
should be extended to cover the instant case.

Plaintiff's act, while basically for the purpose of entertain-
ment, was televised in connection with a public event of general
interest. It appeared through a medium which affords unique
opportunities for the instantaneous dissemination of news and
events of public import, a medium which should not be confined
by too restricted a delineation of the permissible scope of its
operation.

Media for the dissemination of news — and that includes tele-
vision and radio, as well as the press in its various forms —
clearly are not precluded by section 51 of the Civil Rights Law
from publishing or depicting matters of public interest. They
are free to report descriptions of plays and other forms of
entertainment and of the characters participating therein,
whether in the form of narrative, commentary, or pictorial
reproductions of scenes therefrom. All of this comes within
the category of news or information or the treatment of matters
of public interest or of educational content.

It is urged, however, that when the plaintiff's animal act was
reproduced without authorization, the defendants exceeded the
legitimate bounds of permissible reporting of matters of public
interest and that, in so doing, they must be deemed to have
made such reproduction " for the purposes of trade " within
the meaning of section 51 of the Civil Rights Law.

This is the strongest argument which can be made for the
plaintiff's position in this case but, while plausible, it is on
analysis without legal foundation. The important distinction
between this case and *Binns* v. *Vitagraph Co.* (210 N. Y. 51,
*supra*) is that here, unlike the *Binns* case, there was no drama-
tization or fictionalization whatever. Likewise there is a dis-

tinction between this case and cases like *Franklin* v. *Columbia Pictures Corp.* (246 App. Div. 35, affd. 271 N. Y. 554, *supra*) and *Redmond* v. *Columbia Pictures Corp.* (277 N. Y. 707, *supra*), for here, so far as this record shows, the dialogue accompanying the animal act was merely descriptive and reportorial. Defendants injected no extraneous comment nor did they use or purport to use plaintiff's act merely as one element in the creation of a composite or a new or different type of entertainment. Plaintiff's act was televised exactly as it was publicly exhibited, without variation, unembroidered and unalloyed.

Furthermore, the extent of the impingement on plaintiff's privacy would in this case seem to be minimal. There was no substantial invasion of plaintiff's " right to be let alone " in telecasting an act voluntarily performed by plaintiff for pay before 35,000 spectators.

In the light of the history of section 51 and its subsequent judicial interpretations, it is clear that this statute was never intended to apply to cases like the instant one. The statutory creation in this State of a limited right of privacy was intended for the protection of the personality of an individual against unlawful invasion. (See *Roberson* v. *Rochester Folding Box Co.*, 171 N. Y. 538, and *Rhodes* v. *Sperry & Hutchinson Co.*, 193 N. Y. 223, affd. 220 U. S. 502.) It provided primarily a recovery for injury to the person, not to his property or business. The recovery is grounded on the mental strain and distress, on the humiliation, on the disturbance of the peace of mind suffered by the individual affected. True, where an individual's right of privacy has been invaded there are certain other elements which may be taken into consideration in assessing the damages. Thus, where a cause of action under the civil rights statute has been established, damages may include recovery for a so-called " property " interest inherent and inextricably interwoven in the individual's personality (see *Redmond* v. *Columbia Pictures Corp.*, 277 N. Y. 707, *supra*), but it is the injury to the person not to the property which establishes the cause of action. That is the focal point of the statute.

There is no right of privacy, under our statute, applicable to a business or to a public dramatization or exhibition. It is the individual, not his business, which is protected against unlawful intrusion. Binns recovered not because his business had been hurt but because his own personality had been unlawfully invaded by fictionalization. Redmond recovered not because he lost an opportunity to sell his act but because his individual

personality had been improperly injured by extraneous dialogue. So in the instant case what has been injured is not the personality of the plaintiff, but solely, if at all, the value of his act for television purposes or otherwise. Section 51 of the Civil Rights Law was not enacted to fill gaps in our copyright statute, or to supplement causes of action based on contracts express or implied or to extend the law relating to unfair competition or to the appropriation of another's business or enterprise (*Jaccard* v. *Macy & Co.*, 265 App. Div. 15).

We hold therefore that under all the facts and circumstances of this case, as disclosed in the record before us, plaintiff has failed to establish a cause of action for a violation of section 51 of the Civil Rights Law. We pass only on the question argued and briefed on this appeal. We do not here pass upon the question as to whether, upon a proper record, plaintiff could recover on quasi contract or on any other legal theory.

The determination of the Appellate Term and the judgment of the City Court should be reversed and the complaint dismissed, with costs to the appellant.

PECK, P. J., GLENNON and CALLAHAN, JJ., concur; COHN, J., dissents and votes to affirm.

Determination of the Appellate Term and judgment of the City Court of the City of New York, reversed, with costs in all courts to the defendants-appellants, and the complaint dismissed, with costs. [See 279 App. Div. 559.]