JAMES J. HILL et al., Respondents, *v.* JOSEPH HAYES et al., Defendants, and TIME, INC., Appellant.

First Department, May 14, 1963.

486

*Harold R. Medina, Jr.,* of counsel (*Oliver C. Biddle* and *Alan J. Hruska* with him on the brief; *Cravath, Swaine & Moore,* attorneys), for appellant.

*Leonard Garment* of counsel (*Donald J. Zoeller* with him on the brief; *Mudge, Stern, Baldwin & Todd,* attorneys), for respondents.

STEVENS, J. This is an appeal from a judgment entered after a jury trial which resulted in a verdict for the plaintiffs. The action is one for damages based on a violation of plaintiffs' right of privacy under section 51 of the Civil Rights Law. This section, in pertinent part, provides: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action * * * to prevent and restrain the use * * * and may also sue and recover damages for any injuries sustained".

On September 11, 1952, the plaintiffs and their children were held captive in their own home in Whitemarsh, Pennsylvania, for 19 hours by three escaped convicts. Sometime in the early morning of September 12, 1952, the convicts departed, leaving plaintiffs and their family unharmed. The incident received wide publicity at the time and was given extensive press coverage. Plaintiff James J. Hill, in a statement given to the press almost immediately after the occurrence, stated the family had not been molested or harmed and, save for the restraint, had been treated courteously.

Plaintiffs sought to forget their ordeal, and a few months later plaintiffs and their family moved to Old Greenwich, Connecticut. The move, a result of job promotion, was accelerated because of the September, 1952 incident. Opportunities to capitalize on the occurrence were rejected. The record reveals plaintiffs' refusals in an attempt to avoid further publicity for the sake of their children.

In the Spring of 1953, a book, "The Desperate Hours", was written by Joseph Hayes, which was later made into a play and also a picture bearing the same title. The story dealt with three escaped convicts holding a family as hostages in their suburban home. Some of the members of the family were assaulted, profanity was used and in other ways the story differed from the account given by Hill of what had occurred in their home.

In 1954, the play opened for a tryout in Philadelphia, Pennsylvania. Following conferences with the producer, *Life* magazine decided to do an article on the play. Thereafter *Life* arranged

to have the Whitemarsh home made available for photo coverage, and chiefly at its own expense transported members of the cast to the house where it shot actual scenes from the play. It must be remembered this was the house where the real Hill incident occurred. In connection with and accompanying the article *Life* featured these scenes. The article, which appeared in *Life's* February 28, 1955, issue under a heading " True Crime Inspires Tense Play ", read, in part, as follows: " Three years ago Americans all over the country read about the desperate ordeal of the James Hill family, who were held prisoners in their home outside Philadelphia by three escaped convicts. Later they read about it in Joseph Hayes's novel THE DESPERATE HOURS, inspired by the family's experience. Now they can see the story re-enacted in Haye's Broadway play based on the book, and next year will see it in his movie, which has been filmed but is being held up until the play has a chance to pay off."

Thereafter plaintiffs instituted suit. It is from a judgment in their favor that this appeal is taken.

The right of privacy is purely statutory (*Gautier* v. *Pro-Football, Inc.,* 304 N. Y. 354, 358). The section is designed " to prevent the use of an individual's name for commercial purposes without his consent " (*Orsini* v. *Eastern Wine Corp.,* 190 Misc. 235, 236). It is immaterial whether the use by defendants of the name holds the party up to ridicule or contempt since the action is not one for libel (*Binns* v. *Vitagraph Co. of America,* 210 N. Y. 51, 54; *Callas* v. *Whisper, Inc.,* 198 Misc. 829, 831).

" The test for legally protected privacy may involve either the decency of the public interest in the events involved or the fame or notoriety of the person asserting his privacy interest or both " (1 Harper and James, Torts, § 9.7, p. 687). So too " either or both of two factors may be involved in justifying a breach of the seal of privacy; the propriety of public information as newsworthy, in the light of the habits, customs and values of our society and the extent to which the plaintiff, either by his voluntary conduct or because it was thrust upon him, has achieved the position of a ' public figure ' and thus become newsworthy " (*ibid.,* pp. 686–687). New York also requires that the use of the name, etc., be for advertising purposes or for the purposes of trade. For the right protected is the right to be protected against the commercial exploitation of one's personality without his written consent (Civil Rights Law, § 51).

In September, 1952, when the incident occurred, plaintiffs were projected unwillingly into the limelight and, under the test enunciated, had no legally protected privacy so far as legitimate, accurate reporting and fair comment were concerned.

They were newsworthy. The passage of time tended to dim the public interest both because of other events, actually or apparently of greater public interest or significance, and because plaintiffs themselves avoided capitalizing on the occurrence. In other words, the occurrence had been relegated to the outer fringe of the public consciousness.

When the defendant, in its article of February 28, 1955, revived or intensified interest in the ordeal which plaintiffs had experienced, the use of plaintiffs' name was primary and not merely incidental to the article (cf. *Wallach* v. *Bacharach,* 192 Misc. 979, affd. 274 App. Div. 919). Although the play was fictionalized, *Life's* article portrayed it as a re-enactment of the Hills' experience. It is an inescapable conclusion that this was done to advertise and attract further attention to the play, and to increase present and future magazine circulation as well. It is evident that the article cannot be characterized as a mere dissemination of news, nor even an effort to supply legitimate newsworthy information in which the public had, or might have a proper interest.

Hayes, the author of the play "The Desperate Hours", in an article which appeared January 30, 1955, in *The New York Times,* had stated the play was fictionalized. This article was available to, and, in fact apparently in the possession of the defendant when its publication of February 28, 1955, appeared. Defendant did not seek to ascertain from Hayes if his play was an account of what happened to the Hills. Defendant merely concluded that basically the play was a re-enactment and so stated. The contention of defendant that it found points of similarity in the book and the occurrence of September 11, 1952, justified neither the identification nor the commercial exploitation of plaintiffs' name and family with the play.

While there is sufficient evidence to support a jury verdict on the question of liability, prejudicial error was committed which undoubtedly influenced, improperly, the jury's determination as to the quantum of damages. Accordingly, a retrial is directed, limited solely to that question.

Since a retrial is being directed on the sole issue of damages, certain matters may be adverted to for the guidance of the parties. The admission into evidence and viewing of the film by the jury constituted substantial prejudicial error. The film was released almost one year after the article appeared, and subsequent to the institution of the suit. The emotional impact of viewing a highly charged, tense, dramatic film portrayal of incidents of the nature here involved, with accompanying sound effects, was inflammatory and undoubtedly served to influence

the jury improperly. Because of the remoteness in time it is doubtful that much, if any, of the public recalled the article or were significantly influenced by it. Elements and factors were introduced by the showing of the film for which defendant should not fairly be held responsible.

The plaintiff James J. Hill was permitted to testify in broad general terms about comments and questions directed to him by various persons, not otherwise identified, concerning his connection with or relation to the characters portrayed in " The Desperate Hours ", and their reaction to his responses. The incidents were not specifically related or, as pointed out, the persons identified. This was error. Defendant could neither disprove the assertions by calling such persons nor could it cross-examine the alleged speakers. " The better practice would be to call as witnesses for plaintiff, subject to cross-examination, the persons who were supposed to have spoken or acted adversely to plaintiff and to demonstrate, if such demonstration be possible, a connection to the libel " (*Macy* v. *New York World-Tel. Corp.*, 2 N Y 2d 416, 422). It is true the observation quoted was made in a libel case. However, it is equally applicable in a case of this nature because of the evil it is designed to prevent. It is the fact of wrongful intrusion on privacy and the state of mind and effect on the Hills which is important. For the right sought to be protected by statute is the right to be left alone.

Equally improper is it to place into evidence articles which appeared subsequently when no direct causal connection to the offending article is shown either by competent supporting testimony, or by some proof of identity of language sufficient to permit, if not compel, an inference of causal relationship. Defendant is thus charged with the transgressions of others, if such there were, without any proof of its responsibility therefor.

We find the verdicts grossly excessive. In passing it might be noted the briefs are inordinately and unjustifiably lengthy, and no costs are awarded.

The judgment appealed from should be modified on the law and in the exercise of discretion, and a new trial directed on the sole issue of damages. As so modified, the judgment appealed from should be otherwise affirmed, without costs to either party.

RABIN, J. (concurring). The use of the " name, portrait or picture of a living person in truthfully recounting or portraying an actual current event " is not proscribed by section 51 of the Civil Rights Law (*Binns* v. *Vitagraph Co. of America*, 210 N. Y. 51, 56). The same is true with reference to a past newsworthy

event if it bears some relationship to the current event portrayed. The difficulty with the position of the defendant *Time* is that it portrayed the previous Hill incident in a highly sensational manner and represented that the play was a true version of that event. It was not. It was fictionalized and the jury so found. Consequently it violated section 51 of the Civil Rights Law (see *Gautier* v. *Pro-Football, Inc.,* 278 App. Div. 431, 435; *Molony* v. *Boy Comics Publishers,* 277 App. Div. 166, 169; *Lahiri* v. *Daily Mirror,* 162 Misc. 776).

Properly presented, the Hill incident could have been referred to in the article reviewing the play without subjecting the defendant to liability despite the fact that to do so would constitute an invasion of the Hills' privacy and might cause them grief and distress. The right of privacy must give way to the public interest in having newsworthy material disseminated albeit the presentation of such newsworthy material increases the publisher's circulation and a trade benefit flows therefrom (see *Gautier* v. *Pro-Football, Inc., supra,* p. 435; *Thompson* v. *Close-Up, Inc.,* 277 App. Div. 848).

However, if it can be clearly demonstrated that the newsworthy item is presented, not for the purpose of disseminating news, but rather for the sole purpose of increasing circulation, then the rationale for exemption from section 51 no longer exists and the exemption should not apply. In such circumstance the privilege to use one's name should not be granted even though a true account of the event be given — let alone when the account is sensationalized and fictionalized. Such a rule would accomplish the purpose sought to be achieved by the section and furthers the attempt to curb the evils these sections seek to avoid (see Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 [1890]; *Roberson* v. *Rochester Folding Box Co.,* 171 N. Y. 538; *Lahiri* v. *Daily Mirror,* 162 Misc. 776, *supra*).

This concept is not unusual or foreign to our law. It is analogous to the theory upon which liability is imposed in defamation actions upon a defendant who asserts a qualified privilege. Such privilege is held to be no defense where it is demonstrated that the defamatory material was published with malice. Thus, in this case the defense that the article treats with a newsworthy event is to no avail if it was published, not for the purpose of disseminating news but rather for the sole purpose of enhancing appellant's sales of its magazine. The record in this case permits of such a finding and such a finding would be well supported by the evidence. It is quite obvious that the reference to the Hill incident was not incidental to the review of the play. It would seem that the converse is true and it is

quite apparent that its portrayal in such a sensational and fictional manner was not for its newsworthy content but for the purpose of trade.

BOTEIN, P. J. (dissenting in part). The article complained of was a report upon a new play, traditionally a newsworthy subject, and one that may be reported by "pictorial reproductions of scenes therefrom" (see *Gautier* v. *Pro-Football, Inc.*, 278 App. Div. 431, 437, affd. 304 N. Y. 354). To point out, in an article of that nature, a relation between the play and the concededly newsworthy incident in which plaintiffs had been involved creates no cause of action in their favor under section 51 of the Civil Rights Law unless they can show that the incident "has so tenuous a connection with the news item or educational article that it can be said to have no legitimate relation to it" (*Lahiri* v. *Daily Mirror, Inc.*, 162 Misc. 776, 782, SHIENTAG, J.; and see, also, *Dallesandro* v. *Holt & Co.*, 4 A D 2d 470, 471). This cannot be said here. As plaintiffs had been held prisoners in their home by escaped convicts, with consequent widespread publicity, and as such an occurrence formed the basic theme of the play, which was news in itself, obviously references to this common feature in the report of the play were of "some relevance to the reporting of news" (*Gautier* v. *Pro-Football, Inc.*, 278 App. Div. 431, 435, *supra*). Such relevance was confirmed by the admission of the playwright — a witness called by plaintiffs — that "the Hill incident — unconsciously — triggered the book [which he had written and from which he contrived the play] in a very direct way".

Overstrained, in my view, is the court's conception of the article as a fictional recreation of the Whitemarsh incident. Had a review of the play in a daily newspaper summarized some of the scenes and then stated that the play was inspired by the Hills' misadventure, I question that section 51 would have been considered applicable. Yet that is the tenor of the instant article, except that the scenes were depicted by pictures instead of words, a permissible substitution as above stated. To be sure, a searching eye can detect elements of inaccuracy or exaggeration in the article. By taking the pictures in the Whitemarsh house, as well as by words, defendant indicated that the incident there inspired the play. Though the incident happened in September, 1952 and the novel on which the play was based was written the following Spring, perhaps it is an overdrawn inference from their common features above mentioned that the one inspired the other; and perhaps it is erroneous to say that an occurrence is the inspiration of a work when it is only the unconscious trigger. Perhaps the word

"story" in the last sentence of the excerpt quoted in the majority opinion can be construed as a reference to the Whitemarsh incident rather than to the word "novel" in the preceding sentence. But, especially when it is recalled that "[t]ruth or falsity does not, of itself, determine whether the publication comes within the ban of sections 50 and 51" (*Koussevitzky* v. *Allen, Towne & Heath*, 188 Misc. 479, 484, SHIENTAG, J., affd. 272 App. Div. 759), can it be said that such flaws are of so extravagant a nature as to convert into fiction an informative presentation of legitimate news? In my opinion not; we are in a domain where "the lines may not be drawn so tight as to imperil more than we protect" (*Oma* v. *Hillman Periodicals*, 281 App. Div. 240, 245; cf. *D'Altomonte* v. *New York Herald Co.*, 154 App. Div. 453, mod. 208 N. Y. 596; *Goelet* v. *Confidential, Inc.*, 5 A D 2d 226).

To hold, as suggested in the concurring opinion, that a violation of section 51 may be established by a showing that a newsworthy item has been published solely to increase circulation injects an unrealistic ingredient in the complex of the right to privacy, and would abridge dangerously the people's right to know. In the final analysis, the reading public, not the publisher, determines what is newsworthy, and what is newsworthy will perforce tend to increase circulation.

I would dismiss the complaint.

VALENTE and MCNALLY, JJ., concur with STEVENS, J.; RABIN, J., concurs in opinion; BOTEIN, P. J., dissents in part in opinion.

Judgment modified on the law and in the exercise of discretion, and a new trial directed on the sole issue of damages. As so modified, the judgment appealed from is otherwise affirmed, without costs to either party.