**Michael MEEROPOL and Robert Meeropol, Plaintiffs,**

v.

**Louis NIZER et al., Defendants.**

**No. 73 Civ. 2720 HRT.**

United States District Court,
S. D. New York.

July 31, 1974.

See also, D.C., 361 F.Supp. 1063.

Friedman & Perlin by Marshall Perlin, New York City, for plaintiffs.

Phillips, Nizer, Benjamin, Krim & Ballon by George Berger and Martin Stein, New York City, for defendant Louis Nizer.

Satterlee & Stephens by Robert M. Callagy and James F. Rittinger, New York City, for defendant Doubleday & Co., Inc.

## OPINION

TYLER, District Judge.

Defendants Louis Nizer ("Nizer") and Doubleday & Company, Inc. ("Doubleday") have moved for summary judgment pursuant to Rule 56, F.R.Civ.P., dismissing the second count of the complaint in which plaintiffs Michael Meeropol and Robert Meeropol ("the Meeropols") seek $1,000,000 in damages for alleged defamation and invasion of plaintiffs' privacy by reason of statements appearing in the book entitled *The Implosion Conspiracy,* written by the defendant Nizer and published by the defendant Doubleday. For the reasons stated below, the motion is granted.

Plaintiffs are the natural children of Julius and Ethel Rosenberg who were executed in June, 1953, following a trial for conspiring to transmit to the Soviet Union information relating to the national defense in violation of 50 U.S.C. § 34. The present action arises from the publication of an account of the Rosenberg-Sobell trial ("Rosenberg trial") and subsequent events culminating in the execution of the Rosenbergs. In their complaint, plaintiffs allege that Nizer utilized substantial portions of copyrighted letters written by Ethel and Julius Rosenberg to each other juxtaposed to "false, fictitious, and distorted statements" to "deceive the reader and to impress the public with the authenticity and credibility" of the writings in order to embarrass, humiliate and ridicule both plaintiffs and their parents. Plaintiffs further allege that the defendants have sought to pass off the book as an accurate rendition of the trial and other legal proceedings solely for promotional purposes.

Apart from the aforementioned allegations that the book fails to depict the legal proceedings of the trial in an accurate and detached manner, the complaint alleges that the defendants sought to portray the interrelationship of the plaintiffs and their parents as "one wherein the parents manipulated the plaintiffs, resulting in the ultimate rejection of and dissociation with their parents by plaintiffs." In this regard, plaintiffs assert that the defendants knew the writings to be false, fictitious and distorted; failed to properly investigate the facts concerning the events they sought to portray; and published the false and fictitious statements in reckless disregard of the truth or falsity of the statements.

In response to defendants' interrogatories, as revised in this court's order dated January 14, 1974, the plaintiffs have specified 77 pages or passages of the book upon which they have based their claims of libel and invasion of privacy.

## I. DEFAMATION

This motion, of course, requires application of the principles enunciated in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), extended in Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), and, most recently, constricted in Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Defendants have moved for summary judgment on the grounds that no genuine issues of material fact exist and they are entitled to judgment as a matter of law.

■ Plaintiffs predictably contend that this motion is not presently ripe for decision because there are issues of fact

as to the truth or falsity of specific passages in the book and as to defendants' malicious intent to injure plaintiffs by the falsity of the passages. But, plaintiffs cannot defeat the motion for summary judgment by asserting that there is an issue for the jury as to malice unless they make some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred. Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774 (1968). As I view the record, plaintiffs have failed to produce any evidence beyond the mere allegations that defendants published the book with reckless disregard of the falsity of its contents.

■ Summary judgment is particularly appropriate at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matters of public interest and concern. In recognition of the constitutional privilege of free expression secured by the First and Fourteenth Amendments, the courts in libel actions have recognized the need for affording summary relief to defendants in order to avoid the "chilling effect" on freedom of speech and press. Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Konigsberg v. Time, Inc., 312 F.Supp. 848 (S.D.N.Y.1970); Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969), aff'd., 449 F.2d 306 (9th Cir. 1970). Accordingly, the constitutional privilege mandates the granting of a motion for summary judgment as soon as it becomes clear that a plaintiff cannot establish the "actual malice" required for recovery in defamation actions of this nature.[1]

■ An analysis of a libel claim must commence with the seminal case of New York Times v. Sullivan, 376 U.S. 254, 84

---

1. E.g., Miller v. News Syndicate Co., 445 F.2d 356 (2d Cir. 1971); Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5th Cir. 1970); Treutler v. Meredith Corp., 455 F.2d 255 (8th Cir. 1972); Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir. 1971); Dacey v. Florida Bar, Inc., 427 F.2d 1292 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969); Twenty-five East 40th Street Restaurant Corp. v. Forbes, 30 N.Y.2d 595, 331 N.Y.S.2d 29, 282 N.E.2d 118 (1972).

S.Ct. 710, 11 L.Ed.2d 686 (1964). In *New York Times,* the Supreme Court superimposed constitutional limitations on state libel laws and held that the freedoms of speech and of the press guaranteed by the First and Fourteenth Amendments prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct, unless he proves that the statement was made with "actual malice", which the court defined as the publication of false statements with actual knowledge of their falsity or with reckless disregard for their truth or falsity. 376 U.S. at 279–280, 84 S.Ct. 710. See, also Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Miller v. News Syndicate Co., 445 F.2d 356 (2d Cir. 1971).

A logical extension of the *New York Times* rule followed three years later in Curtis Publishing Co. v. Butts, and its companion, Associated Press v. Walker, 388 U.S. 130, 162, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967). The Court therein concluded that the *New York Times* test should apply to criticism of "public figures" as well as "public officials". In *Curtis* and *Walker,* the Court extended the constitutional privilege to protect defamatory criticism of non-public officials who "are nevertheless intimately involved in the resolution of important public questions, or, by reason of their fame, shape events in areas of concern to society at large." *Id.,* at 164, 87 S.Ct. at 1996.

In 1971, a plurality of the Court extended the constitutional privilege once again to protect defamatory criticism against private individuals, Rosenbloom v. Metromedia, 403 U.S. 29; 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Although no more than three Justices joined in any single opinion in *Rosenbloom,* Mr. Justice White, in a concurring opinion, summarized the concensus of the opinions this way:

"[I]t would seem that at least five members of the Court would support each of the following rules:

For public officers and public figures to recover for damage to their reputations for libelous falsehoods, they must prove either knowing or reckless disregard of the truth. All other plaintiffs must prove at least negligent falsehood, but if the publication about them was in an area of legitimate public interest, then they too must prove deliberate or reckless error."

Thus, a plurality of the Court agreed that to sustain an action for defamation when the public or general interest privilege applies, the complainant must offer "clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." 403 U.S. at 52, 91 S.Ct. at 1824. According to *Rosenbloom,* one who published a communication concerning another on a matter of public or general interest was not subject to liability, even though the communication was false and defamatory, unless he published it with knowledge of its falsity, or in reckless disregard of its truth or falsity. *Rosenbloom, supra;* Restatement Second on Torts, § 581A (Tentative Draft April 25, 1974). The focus in *Rosenbloom* was directed to the newsworthy event; the event or issue was the significant aspect, rather than the individual involved.

On the eve of this memorandum, the Supreme Court decided Gertz v. Welch, *supra,* which has the effect of circumscribing the *Rosenbloom* decision. The issue in *Gertz* was whether a newspaper or broadcaster, having published defamatory falsehoods about an individual who was neither a public official nor a public figure, could claim a constitutional privilege against liability for the injury inflicted by those statements. The Court concluded that the *New York Times* standard requiring actual malice was inapplicable in a case involving a private individual. In effect, the Court adopted the dissenting opinion of Justice Harlan in *Rosenbloom.* In his dissent in *Rosenbloom,* Justice Harlan concluded that the

constitutional privilege should not obtain where defamatory falsehood harmed a private individual. He concluded that the states could constitutionally allow private individuals to recover damages for defamation on the basis of any standard except liability without fault.

In *Gertz,* the Court reaffirmed the standards, first enunciated in *New York Times* and *Curtis,* immunizing from liability publishers of defamatory falsehoods concerning public officials and public figures unless the plaintiff can show that the publisher knew the statement was false or in reckless disregard of the truth. The Court deemed the *Rosenbloom* extension to private individuals "unacceptable" and held that the states can permit recovery for libel by a private individual without proof of the publisher's knowledge of falsity or reckless disregard of the truth, even though the defamation might concern a matter of public interest.

■ The teaching of *Gertz,* nonetheless, avails plaintiffs little; its applicability to the present case is severely limited. Under the tests enunciated in *Curtis* and *Gertz,* plaintiffs surely must be classed as public figures. Beyond any doubt, they have "assumed roles of especial prominence in the affairs of society" and "they invite attention and comment." *Gertz, supra,* 418 U.S. at 345, 94 S.Ct. at 3009.

As children of the Rosenbergs, the plaintiffs spent much of their early years in the public spotlight. The activities of their parents were monitored by book, magazine and newspaper throughout the world. As children of famous parents, they achieved "general fame or notoriety in the community." *Gertz, supra* at 352, 94 S.Ct. at 3013. Notwithstanding the fact that plaintiffs later may have renounced the public spotlight by changing their name to Meeropol, as

children they were the subjects of considerable public attention. Significantly but not surprisingly in this respect, the only reference to plaintiffs as adults is on the last page of *The Implosion Conspiracy,* and plaintiffs do not claim that this reference is defamatory.

The Court in *Gertz* distinguished among defamation plaintiffs by the remedy available to the injured party:

"The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater."

Plaintiffs have not, and, indeed, cannot argue that they do not have access to the channels of effective communication.[2]

Accordingly, I conclude that the test to be applied in the present case is the *New York Times* standard as extended to public figures in *Curtis.* In order to be held liable, defendants must have acted with a "high degree of awareness of . . . probable falsity." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). The evidence in this case reveals that defendants had no such awareness.

■ Of the 77 passages complained of, 48 do not mention or refer to plaintiffs but refer only to plaintiffs' parents or others. Plaintiffs do not contend that they have an actionable claim because their parents have been

---

2. Twenty years following the events contained within the book, we currently find the drama of the trial portrayed on special television documentaries and discussed with some regularity in newspaper accounts. See, e.g., New York Times at 1, March 10, 1974.

libeled;[3] rather, they assert that the defamatory passages concerning their parents cast a direct reflection upon themselves and are thus actionable. Typical of these passages is the following:

"When Ethel and Julius learned of the new setback, they were not surprised but their spirits dropped even lower. They fought collapse by writing love letters to each other."

The text then extracts a couple of sentences from letters written by Ethel and Julius to each other indicating their passionate desire to be together. In this context, plaintiffs assert that they have been libeled by the mere omission of portions of the letter referring to their parents' feeling for the children. Plaintiffs argue that because references to the children have been excised from the letters, the book presents a jaundiced and inaccurate portrayal of the parents' filial love and concern. They claim that defendants seek to impart to readers that plaintiffs "have rejected and dissociated themselves from their parents" and from what they represented. Finally, they urge that defendants have bowdlerized portions of the letters in order to insinuate parental rejection of plaintiffs by Ethel and Julius through their passive acceptance of their execution and martyrdom.

In this court's view, such arguments are tortured, contrived and meritless. Upon construing the passages that contain letters with references to plaintiffs excised in light of the entire text, one can only conclude that defendants have fairly and accurately portrayed the family struggles throughout the trying events following the trial. Assuming *arguendo* that defendants did excise portions of the letters that revealed the parents' love and concern for the children, this does little or nothing to satisfy plaintiffs' burden of showing malice on the part of defendants.

*The Implosion Conspiracy*, as indicated by its contents and the affidavits of the author and the publisher, was the product of considerable research and care. Defendant Nizer, in deposition, has described the extensive note-taking of the official records of the case. In his affidavit, the senior consulting editor of Doubleday, Kenneth D. McCormick, has stated that he was aware of the preparation and research that went into the writing of the book. McCormick attested to the practices followed in the publication of the book and denied having knowledge or belief that any of the statements contained in the book were false or were published with malice.

Conversely, plaintiffs' sole opposing affidavit is that of their chief counsel, who merely reasserts the allegations of the complaint. The record as a whole, thus, establishes that there was no knowledge of falsity (if indeed, there is a falsity), no serious doubt concerning the truth of any statement in the article and certainly no reckless disregard of whether statements in the book were false.

To the extent that *The Implosion Conspiracy* contains minor fictionalization or approximations of conversations that may have taken place between plaintiffs and their parents, these cannot be considered defamatory. Such techniques do not rise to the constitutional level of a clear and convincing showing of reckless disregard. As in Miller v. News Syndicate, *supra*, any "deviations from or embellishments upon" the information obtained from the primary sources relied upon were minuscule and can be attributed to the leeway afforded an author who attempts to recount and popularize an historic event.

3. In New York, no person, not even a close relative or descendant, can bring an action for defamation of a deceased person, Rose v. Daily Mirror, Inc., 284 N.Y. 335, 31 N.E.2d 182 (1940), except, possibly, in those comparatively rare instances where a living relative is able to show that his reputation is damaged by the defamation of the deceased. Eagles v. Liberty Weekly, 137 Misc. 575, 244 N.Y.S. 430. (Sup.Ct. N.Y.Co. 1930) (Valente, J.).

Following a year of discovery into whether defendants published the book with actual malice,[4] plaintiffs continue to assert that they are entitled to further discovery into the truth or falsity of the statements. I disagree.[5] The statements were neither false nor defamatory. Assuming the contrary, it is clear from the record, consisting of extensive interrogatories, depositions, and affidavits, that plaintiffs cannot show that the book was published with actual malice. In the absence of any presentation of facts in opposition, summary judgment must lie.

## II. INVASION OF PRIVACY

In their complaint, plaintiffs also allege that defendants intruded upon their privacy and right to be left alone by falsely portraying a picture of the most personal and intimate aspects of plaintiffs' lives. Defendants respond with a dual contention that the second count must be dismissed because: (1) the statements concern matters of legitimate public interest and are therefore constitutionally protected; and (2) none of the passages complained of legally sustain a claim for invasion of privacy.

An analysis of the plaintiffs' right of privacy must properly and necessarily begin with the incipience of the legal recognition of the right of privacy.[6] Unlike libel, the right of privacy is a relative newcomer to the field of torts. Legal recognition of an individual's "right to be left alone" occurred in 1890 with the publication of an essay on the subject of the right of privacy. Warren and Brandeis, The Right of Privacy, 4 Harv.L.Rev. 193 (1890). In response, the New York legislature enacted sections 50 and 51 of the Civil Rights Law.[7]

4. Defendants' motion for summary judgment on count II of the complaint was originally scheduled for February 15, 1974. Plaintiffs were served with the motion on January 30, 1974, and with defendants' memorandum of law in support of their motion for summary judgment on January 31. After an adjournment was granted pursuant to the request of plaintiffs, an additional request by plaintiffs for an adjournment of the motion to April 5 was denied and oral argument was held on March 1. The court directed the parties to submit briefs, affidavits and statements pursuant to General Rule 9(g) of this court. Plaintiffs' brief in opposition to the motion was filed on March 18, 1974, and the 9(g) statement was filed on April 11, 1974. The affidavit accompanying plaintiffs' brief in opposition was submitted by the plaintiffs' attorney. Indeed, the procedural history of this case is replete with attempts by plaintiffs' counsel to obfuscate the issues and to delay the progress of the case.

5. The central question in an action for defamation or invasion of privacy is not whether the statements are true or false. *Gertz, supra,* 418 U.S. at 338–339, 94 S.Ct. 2997; Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, 783 (1947). In an oft-quoted passage from Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919), Justice Holmes stated that "the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market."

6. The laws of defamation and privacy have tended to merge, and the distinction between these two branches of law has been obfuscated by courts and commentators. That an action for invasion of privacy may come to supplant an action for defamation is not without considerable support. Nonetheless, in the State of New York, both the laws of defamation and privacy remain viable grounds upon which a claim for recovery can be based. Different interests, of course, are safeguarded by the two theories. Generally, the law of defamation protects an individual from harm to relational interests, while the right of privacy has developed to compensate an individual for the injury to his feelings, to prevent inaccurate portrayal of private life, and, in some instances, to prevent one's private life from being depicted at all. Shiles v. News Syndicate Co., 27 N.Y.2d 9, 313 N.Y.S.2d 104, 261 N.E.2d 251 (1970); Warren and Brandeis, 4 Harv.L.Rev. 193, 197 (1890).

7. The pertinent parts of the statute are as follows:
   "Article 5. Right of Privacy
   § 50. Right of privacy—A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.
   § 51. Action for injunction and for damages.—Any person whose name, portrait or picture is used within this state for adver-

In their oft-quoted article, Warren and Brandeis recognized that certain clearly defined limitations to the right existed. They acknowledged the competing interests of the desire to protect "the inviolate personality" on the one hand, and the necessity of keeping the avenues of news and of the dissemination of information free and unimpeded on the other hand. Most important for the purposes of this case, they recognized that the right of privacy "does not prohibit any publication of matter which is of public or general interest." 4 Harv.L.Rev. 193, 214. They drew a distinction between those persons in whose private affairs the community has no legitimate concern and those who have eschewed their right to live their lives screened from public observation and thus are the subject of legitimate interest of their fellow citizens. With striking similitude, courts, in interpreting the New York statutes, have held that those statutes do not apply to items of current and newsworthy interest. Although the Warren and Brandeis article distinguished between a "private" individual and a public figure, the courts have construed the latter term broadly so as to diminish the significance of the distinction. Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, aff'd., 272 App.Div. 759, 69 N.Y.S. 2d 432 (1947).

▮▮▮▮ The activities of the Rosenberg children during the trial and their interrelationship with their parents carried on in the setting of a death row prison were necessary, albeit arguably peripheral, ingredients in the author's attempt to present a complete history of the Rosenberg trial and its aftermath. Assuming any statements in the book are actionable because they invade plaintiffs' right of privacy, they concern matters properly within the "orbit of public interest and scrutiny", Koussevitzky, supra at 783, and thus are constitutionally protected.

Even putting aside the inescapable conclusion that the statements are constitutionally protected, I find that, for other reasons, those statements do not sustain a claim for invasion of privacy. First, 48 of the 77 passages specified by plaintiffs do not refer to them at all. The parties are in agreement that an action for invasion of the parents' privacy will not lie. Rome Sentinel Co. v. Boustedt, 43 Misc.2d 598, 252 N.Y.S.2d 10 (1964). Members of the family of a deceased person cannot sue for invasion of the right of privacy where the statement is made concerning the deceased relative. Schumann v. Loew's Incorporated, 144 N.Y.S.2d 27 (Sup.1953).

Moreover, since they are not named in the book, plaintiffs cannot recover for the remaining 29 passages thereof said to be actionable. Plaintiffs are identified in the book solely as Robert and Michael Rosenberg. Nowhere in the book are they identified or referred to as Meeropol, the name they have used for the last twenty years. This missing element renders the claim for invasion of privacy defective. Toscani v. Hersey, 271 App.Div. 445, 65 N.Y.S.2d 814 (1946); University of Notre Dame v. 20th Century Fox Film Corp., 22 A.D.2d 452, 256 N.Y.S.2d 301, aff'd., 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965).

Plaintiffs lamely contend that they were identifiable, named Rosenberg as they were, because of the existence of a trust fund for their benefit and the fact that the name Rosenberg, as well as their adopted name, has appeared on certain school records. Similarly, in Waters v. Moore, 70 Misc.2d 372, 334 N.Y.S.2d 428

tising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages . . . . ."

(1972), the plaintiff alleged that his right of privacy had been infringed by a fictionalized account of an event in which he participated appearing in the motion picture, "The French Connection." The identification was claimed to be based upon the use of his name in the book [8] and by the performance of an actor whose appearance resembled plaintiff. Relying upon University of Notre Dame v. 20th Century Fox, *supra,* the court dismissed the complaint stating:

> "Neither is the test whether an individual's identity can be ascertained from his involvement with the actual event or by reference to external sources." 70 Misc.2d at 375, 334 N.Y.S.2d at 433.

Ironically, plaintiffs' counsel states in his affidavit that plaintiffs "assumed the name of their adoptive parents and remained incognito through the years", hiding their identity except to a limited number of persons who had been involved in the parents' struggle. In sum, plaintiffs attempt to carry water on both shoulders by saying that *The Implosion Conspiracy* invaded their privacy by causing them to come into public scrutiny, but at the same time claiming they were identifiable as Michael and Robert Rosenberg all along. This they cannot do. The fact remains that their present legal name, which they have been using for twenty years and continue to use, does not appear in the book. This fact renders any possible claim for invasion of privacy under § 51 fatally defective. It is the plaintiffs who have identified themselves to the public, not the defendants.

In an attempt to circumvent the limitations of § 51, plaintiffs claim that new common law right to privacy has been established in New York. See, Gal-

ella v. Onassis, 353 F.Supp. 196 (S.D.N.Y.1972), aff'd. and mod. on other grounds, 487 F.2d 986 (2d Cir. 1973). The courts in New York have consistently held that an action for invasion of privacy is exclusively statutory. Roberson v. Rochester Folding Box Co., 171 N.Y. 538, 64 N.E. 442 (1902); Hill v. Hayes, 18 A.D.2d 485, 240 N.Y.S.2d 286 (1st Dept. 1963). Assuming the *Gallela* case recognized a right of privacy beyond the statutory grant, the court limited its decision to an extreme situation involving abusive, physical intrusion, which is not presented here.

Plaintiffs are not entitled to recover for an invasion of privacy because references to them as the Rosenberg children are highly incidental to the main purpose and subject of the book. Twenty-nine isolated references of a fleeting and peripheral nature are insufficient to support a claim under § 51. University of Notre Dame, *supra.*[9]

Furthermore, the right of privacy statute does not apply to an historical account of a newsworthy event or individual unless the account is fictional in character. *Koussevitzky, supra;* D'Altomonte v. New York Herald Co., 208 N.Y. 596, 102 N.E. 1101, modifying 154 App.Div. 453, 139 N.Y.S. 200; Sidis v. F–R Publishing Corp., 113 F.2d 806, 807 (2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940). *The Implosion Conspiracy* in the main is an historical and factual account of the Rosenberg trial, relying extensively on trial transcripts and primary sources. Although portions of the book can be read to suggest that Ethel and Julius Rosenberg were obsessed with each other and their political objectives to the exclusion of the children, the author has taken pains to present a balanced picture of the family relationships.[10]

---

8. Credits for the motion picture stated it was based on the book.

9. By way of a further ironical inconsistency in plaintiffs' claims, it may be recalled that in their defamation claim, plaintiffs assert that many of the sections that utilize quotations from the Rosenberg letters delete references to the children and thus portray an

inaccurate view of the childrens' relationship to their parents. Aside from the inconsistency, this argument tends to accentuate the incidental nature of references to plaintiffs in the book.

10. See, e.g., *The Implosion Conspiracy, supra,* at 412–413, 473–474.

Unlike the publication at issue in Goldwater v. Ginsberg, see, 414 F.2d 324 (2d Cir. 1967), *The Implosion Conspiracy* is a scholarly study built upon exhaustive research and considerable concern for the subjects of the study. There are statements in the book which plaintiffs might find offensive and, perhaps, to an extent, untrue. There are, however, no revelations of any intimate details which would tend to outrage public tolerance. "There is nothing repugnant to one's sense of decency or [any statement] that takes the book out of the realm of the legitimate dissemination of information on a subject of public interest." *Koussevitzky, supra.* Finally, any reference in the book to the plaintiffs concerns their childhood, and it is flatly acknowledged in the last paragraph of the book that plaintiffs are normal and exemplary young men today.

As a matter of law, therefore, the second count of plaintiffs' complaint must fail, whether understood as a claim for libel or one for invasion of privacy. Summary judgment must be and is granted dismissing this count of the complaint on the merits.

It is so ordered.